[No. 33193-1-I. Division One.   May 30, 1995.]

*In re the Marriage of* MARIANNE JENSEN-BRANCH,
*Respondent, and* JAMES D. BRANCH, *Appellant.*

*James R. Tomlinson* and *Davies Pearson; Arthur C. Wang,* for appellant.

*Deborah A. Bianco,* for respondent.

KENNEDY, A.C.J. — James D. Branch appeals the parenting plan entered with the decree dissolving his marriage to Marianne Jensen.[1] The trial court ordered that Jensen have sole responsibility for the religious upbringing of the couple's two children. Although Branch, who is a member of the Worldwide Church of God, is allowed to take the children to his church when he attends during times when the children are with him, under the plan they are not to receive any religious education or indoctrination from Branch. The trial court based this restriction on the potential for psychological harm to the children arising from the parents' conflicting religious beliefs. Branch argues that this restriction impermissibly infringes upon his right to freedom of religious expression.

We conclude that the trial court could restrict Branch from teaching his children his faith only upon a substantial showing of potential or actual harm to the children as a result of the children's adverse reaction to parental conflict over the children's religious upbringing, and only to the degree necessary to prevent harm to the children. We cannot say as a matter of law that the evidence at trial was insufficient to meet this standard. The trial court's findings leave us uncertain, however, that the court fully considered the evidence in light of the constitutional

---

[1] The decree restored Marianne Jensen-Branch to the use of her former surname, Jensen.

requirements and fully considered whether any lesser restrictions might be sufficient to ensure the children's best interests. Accordingly, we remand for further proceedings in light of this opinion.

## FACTS

James Branch and Marianne Jensen were married on June 20, 1982. They have two children: J.B., born in June 1985, and J., born in May 1987. Jensen filed a petition for dissolution of marriage in May 1992.

Both sides submitted proposed temporary parenting plans. Jensen requested sole decision-making authority over the children. In her affidavit in support of her plan she noted a serious disagreement with Branch over religion, calling his religion a "cult." She also requested that she have the children at Halloween because Branch believed it to be a satanic day, and that Branch be required to obtain her written permission before committing the children to his religion. She also asked that Branch not be allowed to remove the children from school to observe his religious holy days.

Branch's proposed temporary parenting plan asked for sole decision-making authority over the children's religious upbringing. Branch asserted that Jensen had never shown interest in the children's religious training. He denied that his church was a cult. He attached the Worldwide Church of God's "Statement of Beliefs" to his affidavit in support of his temporary parenting plan. In other materials submitted in support of his proposed temporary parenting plan, Branch indicated that the children believed that religious conflict was the cause of their parents' breakup.

Family Court Services social worker Margo Waldroup made a report on the family's status on August 12, 1992. The report was expedited so that it could be considered before the court entered a temporary parenting plan. Waldroup recommended that the children reside with Jensen but see Branch as often as possible. She recognized that

conflict between the parents was the cause of problems that J.B. was suffering. Waldroup did not make a recommendation about religious decision making for the children, but did note that the issue concerned the parties and that it merited further evaluation. Waldroup did not object to the children attending Branch's church during his shared residential time with the children.

A court commissioner entered a temporary parenting plan giving joint decision-making authority to Jensen and Branch.

Before trial, the parties sought the services of a mediator. The mediator informed them that they were too combative to be successful at mediation.

In spite of the focus on religious decision making earlier in the proceedings, Jensen's trial brief did not raise the issue of the children's religious upbringing. Neither was the issue addressed in her opening statement. Instead, Jensen's attorney urged the court to maintain the "status quo" of the temporary parenting plan. Decision making was recognized by the trial court as an issue to be addressed at trial, however, based on Branch's pro se opening statement.

At trial, Barbara Milam, a social worker who counseled the children during the period between separation and trial, testified that, after the parents' separation, J.B. showed symptoms of severe emotional distress. These symptoms included bed wetting, sucking her thumb, anger, nightmares and obsessively using certain stickers as a pseudo-security blanket. Milam recognized that the children had a loving relationship with their father, who she said was a good parent. In Milam's opinion, the children should be placed with their mother as the primary residential parent, in that Jensen was a good mother and had been the children's primary caretaker during the marriage. Milam also testified that she agreed with the report of Margo Waldroup, except as to visitation. Milam believed that the children's residential time with Branch should be reduced because the difficulty of frequent transitions be-

tween the two homes was causing harm, and because, as she matured, J.B. needed to begin to develop friendships in her new neighborhood.

Milam testified that Branch and Jensen were incapable of joint decision making due to the extreme anger they felt toward one another. She did not distinguish the parents' conflict with regard to the children's religious training from their conflict over virtually every other parenting issue.

Jensen testified that she doubted whether she and Branch could ever make joint decisions regarding the children. She called Branch manipulative, controlling, selfish and unable to place the children's concerns before his own. She described an incident where Branch refused to release the children to Jensen's mother after a visitation, causing Jensen eventually to contact the police in order to locate the children. She described other frequent disputes regarding times for pickup and delivery of the children. The enmity she described is amply illustrated in the record of Branch's pro se cross-examination of Jensen during the trial. Cross-examination degenerated into yet another parental bickering match.

Jensen testified to severe disagreement in the area of religion. She thought of Branch's church as a cult, and was concerned that Branch forced the children to go to church (according to the children). Jensen testified that she and the children always celebrated traditional Christian holidays during the marriage, but that Branch's church did not allow this.

On cross-examination, Jensen testified that Branch believed the world would end in two years. She thought Branch's religion was not healthy due to its dietary restrictions, services on Saturdays and baptism only after an understanding of the church's interpretation of the Bible. She also stated that it was "abusive" to tell the children that certain holidays are pagan. She believed the church to have a strong hold on Branch, in that he had gone out of town on Christmas day of the previous year, apparently

for some reason connected with his religion. When asked how Branch's religion might harm the children, Jensen noted that it was a small church, was worldwide, was very strict and fundamentalist and was judgmental of other individuals.

Jensen's mother, Nancy Jensen, corroborated Milam's description of J.B.'s symptoms (bed wetting, thumb sucking, needing stickers and the like). She described how J.B. had become withdrawn, and that there were times when J.B., who would curl into a fetal position, obviously needed comforting, but no amount of comforting provided her any solace. She also recounted J.'s statement about church: "He makes us go and I don't like that." Report of Proceedings vol. 2, at 69. Nancy Jensen also testified that the children seem guarded when asked about Branch's church.

Branch gave little testimony concerning his religion. He denied that the children had not attended church with him until after separation, but could not recall how often they had attended his church before separation. He acknowledged that he had left the children with his mother when he attended church the Saturday prior to the trial. Although the record is far from clear, Branch's testimony seems to reflect that the children attended church with him more frequently as the trial date approached, and seldom attended his church before separation. Branch described the children's activities while in church: they would be there for two hours on Saturday, during which time they would sit with him or lie on blankets with other children and play games, make puzzles or draw.

In the oral ruling, the trial judge observed that Jensen and Branch did not have a satisfactory history of cooperation and shared performance of parenting functions, which precluded joint decision making and frequently alternating residential time. The judge granted Jensen primary residential placement, citing overwhelming evidence that she was the parent who met the children's daily needs. The judge then ordered an end to Branch's Monday visits,

stating that he agreed with the expert that the biggest trauma to the children was being forced to transition too often between the Jensen and Branch homes. The judge specifically stated that this was not the sole cause of J.B.'s trauma, however. Rather, he stated that it was unclear why J.B. was having these problems, but clear that more stability would be in her best interests.

The court then addressed decision making. Again, the court started by noting that the parties could not make joint decisions. He awarded Jensen sole decision-making responsibilities, "and that would include the decision as to religious training." Report of Proceedings vol. 3, at 7. Although neither parent had briefed the constitutional issue, the judge recognized Branch's free exercise rights in raising his children, and so ordered that Branch could take the children along with him to church, but he could not take the children to church for the purpose of indoctrination or teaching. He explained this as in the best interests of the children, given that the mother had sole decision-making authority.

These oral findings were reflected in the final parenting plan. In the mother's proposed draft of the permanent parenting plan, the father would have been required to obtain the written permission of the mother in order to take the children to church for teaching and indoctrination. That sentence is deleted, however, and substituted with: "The court finds that the evidence supports the potential for psychological harm to the children if compelled to attend father's church." Clerk's Papers, at 177. This plan was incorporated by reference into the findings and conclusions and the decree of dissolution of marriage.

This timely appeal followed.

### DISCUSSION

Branch argues that the trial court impermissibly restricted his right to indoctrinate his children in the tenets of his religion. He contends that there was not a clear and affirmative showing of potential or actual harm

to the children resulting from the parents' conflict over religious beliefs. This issue has not been before the appellate courts since the enactment of the Parenting Act of 1987.

RCW 26.09.002 states the policy underlying the Parenting Act. It provides in relevant part:

> In any proceeding between parents under this chapter, the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities. . ... The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.

RCW 26.09.002. In fashioning a parenting plan, the trial court seeks to maintain the child's emotional stability, to clearly establish the parents' responsibilities and to minimize the child's exposure to harmful parental conflict. RCW 26.09.184(1)(b), (d), (e).

To reach these objectives with regard to allocating decision-making authority between the parents, "[t]he plan *shall* allocate decision-making authority to one or both parties regarding the children's education, health care, and religious upbringing." (Italics ours.) RCW 26.09.184(4)(a). The trial court "shall order" sole decision-making authority to one parent if one parent is opposed to joint decision making and that opposition is reasonable under RCW 26.09.187(2)(c). RCW 26.09.187(2)(b). Among the factors the trial court must consider in RCW 26.09.-187(2)(c) are:

> The history of participation of each parent in decision making in each of the areas in RCW 26.09.184(4)(a);

> Whether the parents have a demonstrated ability and desire to cooperate with one another in decision making in each of the areas in RCW 26.09.184(4)(a)[.]

RCW 26.09.187(2)(c)(ii), (iii).

A trial court's decision concerning parental decision making is ordinarily reviewed for an abuse of discretion. *Munoz v. Munoz*, 79 Wn.2d 810, 813-14, 489 P.2d 1133 (1971); *In re Marriage of Kovacs*, 121 Wn.2d 795, 801, 854 P.2d 629 (1993). In exercising discretion, a trial court can consider the parents' religious affiliations in making decisions affecting parental rights. *See In re Marriage of Murphy*, 48 Wn. App. 196, 200-01, 737 P.2d 1319 (1987); *In re Marriage of Hadeen*, 27 Wn. App. 566, 588, 619 P.2d 374 (1980) (Dore, J., dissenting), *review denied,* 95 Wn.2d 1009 (1981). However, in order to protect the parents' respective constitutional rights to the free exercise of religion, Washington courts have created a separate standard where a trial court's order regarding decision-making authority restricts those rights: there must be a substantial showing of actual or potential harm to the children from exposure to the parents' conflicting religious beliefs.[2] *See Munoz v. Munoz*, 79 Wn.2d 810, 813-14, 489 P.2d 1133 (1971) (must be evidence establishing that the exposure to separate religions has had, or will have, an adverse effect upon the children); *Hadeen*, 27 Wn. App. at 579 ("religious decisions and acts may be considered in a custody decision only to the extent that those decisions or acts will jeopardize the temporal mental health or physical safety of the child"); *Robertson v. Robertson*, 19 Wn. App. 425, 427, 575 P.2d 1092 (1978); *see also* Annotation, *Child Custody and Visitation-Religion*, 22 A.L.R.4th 971 (Supp. 1993).

Although the above-referenced court decisions predate the Parenting Act, the holdings of each address the best interests of the child in the context of religious upbringing. These are the same considerations that survive intact in the current code provisions. *See* RCW 26.09.002;

---

[2]We emphasize that "religious beliefs" should be interpreted in the broad sense of "world view", i.e., a parent's lack of religious belief receives the same protection as any particular religious belief. *See* 16A Am. Jur. 2d, *Constitutional Law*, § 465, at 264-67 (Supp. 1994).

26.09.184(4)(a). Former RCW 26.09.250 (enacted in 1973, repealed in 1987) granted the custodial parent decision-making authority over "religious training." When the *Hadeen* case refers to restrictions on the "religious training" of a child, it is in effect talking about decision-making authority. The statute has changed, but the standards have remained constant, as have the parents' rights to free religious exercise.

The requirement of a showing of actual or potential harm to a child which might result if a parent takes the child to that parent's church harmonizes the child's best interest and the parents' constitutional rights to free religious exercise. *See Hadeen*, 27 Wn. App. at 579.

Article I, section 11 (amend. 88) of the state constitution is more protective of religious freedom than is the First Amendment. *First Covenant Church v. Seattle*, 120 Wn.2d 203, 226, 840 P.2d 174 (1992). A burden on free exercise can be justified only by a compelling state interest and using the least restrictive alternative available. *First Covenant Church*, 120 Wn.2d at 226-27. We hold that the requirement that the trial court find a substantial probability of actual or potential harm to children before restricting a parent's decision-making role satisfies the "compelling interest" test of *First Covenant Church*.

■ Each case must be decided on its own facts, as every child is different. Also, a child's needs may vary over time based on his or her continued growth and development. Restrictions imposed at a vulnerable time in a child's life may not be necessary at a later time, either as a result of the child's maturation or because the parents have become more stable as they learn to cope with their own feelings about the separation and divorce. Decision-making orders must be fashioned so as to protect children from harmful exposure to parental conflict while still protecting the rights to free religious exercise—with the best interests of the children the paramount concern. RCW 26.09.002; RCW 26.09.184(e); *Marriage of Hadeen*, 27 Wn. App. at 579. Thus, findings of actual or potential harm must be made

with reference to specific evidence and the specific needs of the children involved, as opposed to general findings of harm which leave an appellate court searching the record for evidence that may or may not have been seen as pivotal or relevant by the trial court.

The trial court need not, in every case, distinguish between harm to the children from parental conflict over religious upbringing and harm to the children from other areas of conflict. Where the children are suffering from parental conflict on virtually every parenting issue, as was the case here, that may be an impossible task. The court must, however, specifically recognize and recount the impossibility of this task, if indeed it is impossible in a given case, to assure a reviewing court that the trial court specifically considered the free exercise rights that are being impacted by the court's ruling. Where the trial court can, by the allocation of decision-making authority, remove the children from exposure to most or all areas of parental conflict except conflict over religious upbringing, the court should then consider whether the children will suffer harm from inevitable conflict if there were to be independent (as opposed to joint) decision making *only* with respect to religious upbringing. This will likely depend on the ages or maturity of the children, their ability to cope with the separation and divorce and the bitterness of the dispute between the parents on this issue. The constitutional right to free exercise of religion does not allow sole decision making in this area, even if the parents are not capable of joint decision making, if leaving each parent free to teach the children about religion *independently* would not cause actual or potential harm to the children. *Cf. Munoz*, 79 Wn.2d at 815 ("We are not convinced, in absence of evidence to the contrary, that duality of religious beliefs, per se, creates a conflict upon young minds.").

In the instant case, the record clearly shows that the parents were incapable of joint decision making and that the constant conflict on a myriad of issues was causing

actual harm to the children, J.B. in particular. The record also shows clearly that Branch and Jensen differed strongly over the children's religious upbringing. There was also some evidence that the children were acutely aware of their parents' conflict concerning religion. Jensen's mother testified that this conflict impacted the children, causing them to be guarded whenever discussing their father's religion.

While we might consider this evidence sufficient to persuade us that sole decision-making authority over religious upbringing was appropriate in this case, we are not the trier of fact. We cannot determine from the trial court's bare assertion in its order that the children would suffer actual or potential harm whether the trial court's decision rested on the evidence we have recounted. Indeed, the evidence as a whole left the trial court uncertain why J.B. was experiencing such severe emotional problems.

The trial court was seriously hampered in its work not only by the failure of the parties to brief the constitutional issues before trial but even more significantly by their failure to explore the degree to which their children's anguish might be related to their religious differences. If the father's perception at the time the parties were proposing their respective temporary parenting plans was accurate, the religious conflict may loom very large in the minds of the children. Clearly the children love both parents and wish that they would reunite. If the children truly view the father's religion as the cause of the separation, or the mother's dislike of the father's religion as the cause of the separation, counseling directed to these feelings would seem to be in order, and the trial court may wish to take this into account in fashioning the parenting plan, so that such restrictions as may be imposed can be tailored to the children's actual needs and not be needlessly restrictive.

We are also mindful of the passage of time since the trial. The children's present needs may differ from those the trial court perceived months ago. The trial court may,

in its discretion, reopen the testimony for additional evidence with respect to the children's best interests as related to parental decision making regarding the children's religious training.

Reversed and remanded for further proceedings consistent with this opinion.

COLEMAN and AGID, JJ., concur.