932 P.2d 652 (1996)
84 Wash.App. 763
In re the MARRIAGE OF Corinne A. WICKLUND, Respondent, and
Ward T. Wicklund, Appellant.
No. 36489-8-I.
Court of Appeals of Washington, Division 1.
December 23, 1996.
Publication Ordered February 10, 1997.
*653 Catherine Wright Smith, Carl T. Edwards, Seattle, and Ronald C. Hardesty, Bellingham, for Appellant.
Peter Frech, Bellingham, for Respondent.
James Talbot, Seattle, for Amicus Curiae American Civil Liberties Union.
GROSSE, Judge.
The trial court prohibited Ward Wicklund from "practic[ing] homosexuality in the sense of exhibiting, or participating in displays of affection ... with a partner" while caring for his four children. Ward appeals this parenting plan provision. We hold that the trial court erred by restricting Ward's conduct based on his sexual orientation. The evidence showed only that the children experienced difficulty adjusting after their parents' separation. But where the only harm is adjustment, the remedy is counseling, not restrictions on the parents' lifestyle in terms of sexual orientation. Accordingly, we reverse the restrictions. We also reverse restrictions on Corinne's conduct, affirm the children's residential placement, and remand to recalculate Ward's lien on the family house.

FACTS
Corinne and Ward Wicklund ended their marriage in 1994. They have three girls, ages 13, 10, and 8, and one boy, age 5. Plaguing their marriage were loud and repeated arguments, instances of physical abuse, infidelity, and alcohol abuse. The couple's difficulties were increased by Ward's gradual acceptance of himself as a gay man, a fact that eventually contributed to the Wicklunds' separation. Ward is now in a permanent relationship with a man. When they married, Ward and Corinne were both active members in the Jehovah's Witness faith, and the religion played an important part in the family's life. Corinne and the children remain active members of the faith. Ward is not active in his faith because of the conflict between the religion and homosexuality.
At trial, family psychologist Dr. Duane Stewart testified that based on his testing, the children exhibited no evidence of a "personality maladjustment" that could be "related to the home." He thought the "children were doing rather well." According to Stewart, the children most strongly identified with Corinne and they expressed anger over catching their father lying. He also reported that "[a]lthough the children are adequately adjusted, their adjustment and well-being are attenuated by the behavior they evidence in transition to their father's residence and lifestyle."
Court-appointed investigator Dr. Allan Needler reported that the children experienced stress and disruption for a sustained period resulting from the conflicts between the parents. He thought the children's stress was abating, and that they were adjusting to the changed circumstances because of the "consistent level of care and attention *654 towards the children by each parent." Because both parents are highly committed to their children, he believed it in the children's best interests to spend equal time with each parent.
Dr. Needler testified that a source of stress in the family was Ward's gradual acceptance of his sexual orientation, observing that:
[T]he long-standing conflict evidenced by this couple and family has resulted from Mr. Wicklund's very gradual acceptance and transition from a heterosexual to a homosexual status. Ms. Wicklund has resultingly experienced abandonment and hostility by virtue of her husband's choice. Mr. Wicklund regularly denied his wife's accusations but also continued to act upon homosexual impulses throughout the marriage. Alcohol abuse during this time by both adults exacerbated the conflicts and the erosion of the marital relationship. There has been a significant course of "cat and mouse" behavior in attempts to firmly verify Mr. Wicklund's sexual orientation. The eldest children have, at times, become little detectives gathering information about their father.
Because it was a "different set of circumstances for [the] children to learn to adjust to their father being involved with another male," Dr. Needler recommended that Ward have no contact with his partner in the presence of the children. He also recommended counseling so that the children could "gain support to address this matter." Noting the conflict between Ward's sexual orientation and the Jehovah's Witness faith, he thought the parents should work with the problem.
Corinne testified that none of the children had any physical, mental, or emotional limitations and that all of the children were doing well in school. She described her children as caring, loving, well behaved, and helpful. At trial, she sought a restriction on Ward's conduct phrased as:
[I]t would be inappropriate to have Ward display intimate relations with his partner until the children are at an age that they are comfortable and assessed ready to accept that lifestyle change and are ready to be able to see that.
Her reasons for the restriction centered around the conflict between Ward's sexual orientation and her religion:
We raised the children believing one way and now they're being forced to have to be put in a situation that we told them basically all along it's not right in God's eyes.... It's hard to have them to be put in a situation even their father was teaching them all along this is inappropriate.
She said that the children were "confused and they don't agree with [Ward's lifestyle].... I know my son doesn't understand at all. The other children have an idea but they're still young and they don't understand either." While they are fine with their father, she believed they are not "comfortable" with his lifestyle. She thought the children needed time to adjust to the situation, possibly with counseling to help the children deal with the changes in their lives.
Ward testified that he recognized the difficulties of the children being exposed to both the Jehovah's Witness teachings and the non-Witness way of life and would do what he could to accommodate the children's beliefs. The court asked Ward, "Have you thought about how you're going to handle your current orientation and lifestyle with your children in light of the religious upbringing they had up until the time of your separation?" Ward answered that he would slowly acclimate his children to the changes and would seek counseling for assistance:
I have tried to gradually introduce them to the idea and understanding of who their father is. I know they accept me and love me as their father but the confusion is to what the religion teaches and to what I'm telling is different and that's the confusion I myself have. This is something that I feel very strongly that having a counselor with the kids is very appropriate to help this process take place. It's not going to happen overnight.
The trial court rejected Dr. Needler's recommendation of no contact, but imposed restrictions on displays of affection and overnight guests. The trial court also found that ordering counseling was unneeded because the two of them had "in the past been doing *655 a fine job in raising these kids and I'm going to give you that opportunity to do that if you think counseling is necessary."
In the parenting plan, the court found that under RCW 26.09.191(3) the mother's and the father's "involvement or conduct may have an adverse effect on the child's best interests because of the existence of the factors which follow[:]"
The parties have voluntarily and diligently raised their four children within the Jehovah [Witness] faith. The court finds that the children of the marriage have been significantly involved in the teachings of the Jehovah Witness faith. The court finds that based upon the evidence presented that although homosexuality in and of itself is not, the outward or demonstrative practice of homosexuality is an abomination to the Jehovah Witness faith and beliefs. The court finds that under the circumstances of this case, the active and outward practice of homosexuality by the [father] in the presence of his children is not in the children's best interest.
The court further finds that it is also not in the children's best interest under the circumstances of this case for the children to witness outward displays of affection by their mother toward a partner, guest, or significant other unless their mother is married to such other person.
The court entered the following restrictions:
[The father] shall not practice homosexuality in the sense of exhibiting, or participating in displays of affection (hand-holding, kissing, etc.) with a partner, "guest", or significant other while the children are in the [father's] care unless the [father] is married to such other person. The [father] shall not allow any such person to sleep in his bedroom while the children are in his care.
The [mother] shall not exhibit or participate in displays of affection (hand holding, kissing, etc[.]) with a partner, guest, or "significant other" while the children are in the parent's care unless the parent is married to the person. The [mother] shall not allow any such person to sleep in her bedroom while the children are in [her] care.
Under the permanent parenting plan, the children reside during the school year with Corinne all week and with Ward every other weekend, and reside half of the summer with each parent.
Ward appeals.

ANALYSIS
Ward claims that the trial court erred by conditioning his residential time on the requirement that he "not practice homosexuality in the sense of exhibiting, or participating in displays of affection (hand-holding, kissing, etc.) with a partner" in the presence of his children. We agree.
We review a trial court's decisions in fashioning a permanent parenting plan for abuse of discretion.[1] The trial court abuses its discretion if it restricts parental rights because the parent is gay or lesbian.[2] While "[t]here are some restraints society places upon parents ... they are few in number and sexual preference is not one of them."[3] Thus, parental conduct may only be restricted if the conduct "`would endanger the child's physical, mental, or emotional health.'"[4]
*656 Corinne argues that the trial court did not restrict Ward's parental rights because he is gay, but rather because "the children were deeply confused and disturbed when they witnessed their father's homosexuality and that some restrictions were necessary." But even if true, this is not a proper reason to order a restriction. The trial court could only order a restriction if it "expressly [found]" that the parent's conduct was "adverse to the best interests of the child."[5] No such situation is presented here.
The record reflects that although the children had experienced stress and disruption from their parents' conflicts, they were adjusting to their parents' separation because of the care and attention of both their parents. They suffered no physical or mental problems, did well in school, and participated in a variety of activities.
Although there may be circumstances involving overt displays of inappropriate parental sexual behavior in the presence of minor children that would justify the sort of restrictions at issue, here the lack of any evidence that Ward was acting inappropriately and the lack of evidence of harm resulting from either parent's conduct render the restrictions particularly inappropriate. The only justifications for them were to help the children adjust to the dissolution. Dr. Needler testified that he thought there should be no contact with any male partner while in the presence of the children because the children needed "to learn to adjust to their father being involved with another male." The trial court thought its restrictions were necessary in order to protect the children from the conflict between homosexuality and their religion.
The children needed to adapt to a new, and sometimes confusing, situation caused by their parents' separation, by their father's sexual orientation, and by his withdrawal from the Jehovah's Witness faith. Problems with adjustment are the normal response to any breakup of a family. But restrictions on a parent's conduct designed to artificially ameliorate changes in a child's life are not permissible. If the problem is adjustment, the remedy is counseling. Here, both parents and Dr. Needler thought counseling was necessary and given the testimony about the children's confusion, this was the necessary solution. The trial court should have fully considered whether to order counseling and should not have entered improper restrictions on Ward's conduct. We hold that the trial court abused its discretion and we order that the restrictions be removed and that the trial court consider whether ordering counseling is necessary.
Because we have resolved Ward's assignments of error, we will not decide the constitutional claims that the restrictions violated Ward's fundamental rights as a parent or infringed on his freedom of religion.
Ward additionally claims that the trial court erred in entering the residential placement provision of the parenting plan, arguing the trial court reduced his time because of his sexual orientation. Under the temporary parenting plan in effect before trial, the children resided with him every weekend. At trial, Ward requested that the children reside with him every other school week. But the trial court acceded to Corinne's request that the children reside with her during the school week, with only alternating weekends with Ward.
In fashioning a parenting plan, the trial court determines the residential arrangement that will serve the best interests of the child.[6] Acting with broad discretion,[7] the trial court considers several factors, including: the strength of the relationship between the parent and the child; the parent's performance of parenting functions; the emotional needs of the child; the child's relationship with siblings; the child's involvement in school or other significant activities; the wishes of the parent and of a sufficiently mature child; and the parents' employment *657 schedules.[8] A trial court, however, may not restrict residential time because of the parent's sexual orientation.[9]
Although the trial court's approach to the issue of homosexuality was not neutral as evidenced by its restrictions on Ward's conductthe record does not support Ward's assertion that the trial court reduced Ward's residential time solely because of his sexual orientation. Both experts reported that the children found it hard going back and forth between the two houses. This concern was shared by their mother who opposed alternating weeks because the children were "busy with school and with activities that we do at our faith." While Corinne did not want the children exposed to what she termed "inappropriate behavior," she was also troubled by the disruption caused by the children being bounced back and forth between the households.
Based on the testimony, the trial court thought the best interests for the children would be served with "as much continuity and as ... little change in the children's lives" as possible. This is a tenable reason for providing for residential placement with Corinne during the school week, with alternating weekends with Ward.
The fact that the weekend time was reduced to every other week from each week is not significant because the court does not draw any presumptions from a temporary parenting plan.[10] We hold that the trial court acted within its discretion in determining the residential time.
Finally, Ward claims that the trial court erred by reducing his lien on the family house. The trial court awarded the house to Corinne. After estimating the capital gains tax liability upon sale, the trial court reduced Ward's lien on the house to account for potential tax. Since there was no evidence that Corinne intended to sell the house, she concedes that the trial court erred in deducting the potential tax. Given the lack of an imminent sale, we agree with both parties that the trial court erred.[11]

CONCLUSION
We reverse the restrictions and the trial court's deduction of the capital gains tax and remand for recalculation of Ward's lien, plus interest as provided for in the original order. Although Corinne does not assign error to the restrictions on her behavior, we agree with Ward that they are unmerited given that the record is devoid of any reason for them. We affirm the residential placement provisions. We remand for consideration of whether an order directing the parents to seek counseling for the children is necessary, and for recalculation of the lien. We deny Ward's request that a new judge be assigned.
KENNEDY, Acting C.J., and BECKER, J., concur.
NOTES
[1] In re Marriage of Kovacs, 121 Wash.2d 795, 801, 854 P.2d 629 (1993); In re Marriage of Jensen-Branch, 78 Wash.App. 482, 490, 899 P.2d 803 (1995). In order to determine if a trial court has abused its discretion we look to see if its decision is based on untenable grounds or reasons, or is manifestly unreasonable. Kovacs, 121 Wash.2d at 801, 854 P.2d 629. The court acts on untenable grounds if its factual findings are unsupported by the record; the court acts for untenable reasons if it has used an incorrect standard, or the facts do not meet the requirements of the correct standard; and the court acts unreasonably if its decision is outside the range of acceptable choices given the facts and the legal standard. State v. Rundquist, 79 Wash.App. 786, 793, 905 P.2d 922 (1995), review denied, 129 Wash.2d 1003, 914 P.2d 66 (1996).
[2] In re Marriage of Cabalquinto, 100 Wash.2d 325, 329, 669 P.2d 886 (1983) [hereinafter Cabalquinto I].
[3] In re Marriage of Cabalquinto, 43 Wash.App. 518, 519, 718 P.2d 7 (1986) [hereinafter Cabalquinto II].
[4] Cabalquinto II, 43 Wash.App. at 519, 718 P.2d 7 (quoting former RCW 26.09.240). See RCW 26.09.191(3); RCW 26.09.002.
[5] RCW 26.09.191(3)(g).
[6] Kovacs, 121 Wash.2d at 801, 854 P.2d 629.
[7] Kovacs, 121 Wash.2d at 801, 854 P.2d 629.
[8] See RCW 26.09.187(3)(a).
[9] Cabalquinto I, 100 Wash.2d at 329, 669 P.2d 886.
[10] RCW 26.09.191(4).
[11] In re Marriage of Berg, 47 Wash.App. 754, 759, 737 P.2d 680 (1987).