IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Marriage of: | ) | |
| | ) | |
| NORMAN D. LESLIE, | ) | No. 30160-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JANELLE L. LESLIE, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |

SIDDOWAY, J. — Janelle Leslie, now Janelle Belton, appeals the residential

placement and decision making provisions of the parenting plan entered for her son with

Norman Leslie. She argues that the final order of child support must be reversed as well.

We find no abuse of discretion by the trial court and affirm.

FACTS AND PROCEDURAL BACKGROUND

Janelle Belton and Norman Leslie attended Deer Park High School together in the

1980s. Following graduation they had no contact until 2007, when Ms. Belton renewed

communication and the two had several long conversations. In July 2008, they spent a

week together in Minneapolis, after which the pair returned to Newport, Washington, as a

couple. Unbeknownst to Mr. Leslie, Ms. Belton was already married. At the time of their trip to Minneapolis, she had lied to her husband, Randy Hitchcock, about going to Minneapolis on business.

Mr. Leslie and Ms. Belton were married in September 2008. They had a son, Dennis,[1] born in February 2010. Five months later they separated, after Mr. Leslie learned of her marriage to Mr. Hitchcock. Mr. Leslie filed suit to have the marriage declared invalid.

Attorney Rebecca M. Coufal was appointed guardian ad litem for Dennis. In November 2010, she filed her initial report. It indicated that Ms. Belton had been Dennis's primary caregiver up until the time of the separation and that at the time of the report, Mr. Leslie was the primary caregiver, although Dennis was cared for by Ms. Belton or baby-sitters when Mr. Leslie worked.

The report recounted an unusual history of misrepresentation by Ms. Belton that Ms. Coufal characterized as complicating the case. Among other misrepresentations, Ms. Belton had falsely told several employers and others that she was a registered nurse; had incurred substantial debt in both marriages without the knowledge of her husbands; and had a history of seeking medical help for herself and for Dennis, for undiagnosable problems that no one else had noticed. At one point Ms. Belton arguably put Dennis in

---

[1] We use a pseudonym for the child's name, consistent with our General Court Order dealing with the use of children's names in opinions, orders, and rulings.

danger when he had sustained a fractured skull, been seen at Harborview Medical Center, and was released into her care based on her representation that she was a nurse. Despite these problems, Ms. Coufal concluded that Ms. Belton loved Dennis and her two other, older children. She recounted in her report that Ms. Belton's oldest child—a son—told Ms. Coufal that his mother "is a caring parent who will do anything for her children." Clerk's Papers (CP) at 4. Even he said that his mother needed to get her personal life together, however, and expressed concern about Ms. Belton being the primary caregiver of his younger half sister and Dennis.

Ms. Coufal reported that her interviews suggested that Mr. Leslie could be unduly rigid. Several persons whom Ms. Belton suggested be contacted, including her parents, described Mr. Leslie as arrogant and having a drinking problem. Ms. Belton told Ms. Coufal of three incidents, which if accurate, would qualify as domestic violence. Evidently the only incident confirmed by Mr. Leslie was that he broke the windshield of a car when Ms. Belton—in the car—refused to relinquish a credit card to him.

Considering all, Ms. Coufal's recommendation was that Mr. Leslie be appointed the primary residential parent and be given sole authority over Dennis's health care. She recommended that restrictions be imposed on where Ms. Belton could take Dennis. Otherwise, Ms. Coufal recommended "a fairly standard parenting plan." CP at 6.

The matter was tried the following spring, in a two-day trial. Both parties testified as did the guardian ad litem and three other witnesses. At the conclusion of trial, the

3

court declared the marriage invalid and entered findings of fact and conclusions of law

and a final parenting plan, designating Mr. Leslie as the primary residential parent and

imposing restrictions on Ms. Belton's decision making authority and residential time. It

entered a final order of child support requiring payments by Ms. Belton of $269 per

month. Ms. Belton appeals.

## ANALYSIS

Ms. Belton appeals the trial court's primary residential placement of Dennis with

his father, its restrictions on her authority and residential time, and its order that Ms.

Belton pay child support.[2] We address the issues in turn.

### I

Washington statutes contemplate that parenting plans for divorced or separated

parents will provide for mutual decision making authority unless there are reasons not to

provide for mutual authority, such as the reasonable opposition by one parent, geographic

distance affecting the parents' ability to make timely mutual decisions, or a statutory

mandate that one parent's decision making authority be restricted. *See* RCW

---

[2] Ms. Belton's reply argues that Mr. Leslie's response brief violates RAP 10.3(a)(5) by failing to support many of its factual statements by any citation to the record. Nearly every fact stated in the brief has a corresponding cite to the record. Any failure to provide citations is minor and has not impaired our ability to decide the issues raised by the appeal. *Cf. Harbor Enters., Inc v. Gudjonsson*, 116 Wn.2d 283, 803 P.2d 798 (1991) (nine pages of asserted facts urged as substantial evidence to support the court's findings but with no citations to the record violated the rule).

26.09.187(2). The circumstances under which a parent's decision making authority must be restricted—physical, sexual, or a pattern of emotional abuse of a child, for example—are set forth in RCW 26.09.191(1).

Subsection (3) of RCW 26.09.191 identifies other parental shortcomings that "*may have an adverse effect on the child's best interests.*" (Emphasis added.) With respect to these shortcomings, the trial court is given discretion to rely upon them to preclude or limit any provision of the parenting plan. Six shortcomings are identified specifically at RCW 26.09.191(3)(a)-(f); RCW 26.09.191(3)(g) also authorizes the trial court to rely on "[s]uch other factors or conduct as the court expressly finds adverse to the best interests of the child."

The final parenting plan entered below found such a factor present in the case of Ms. Belton. It provides:

> The mother's involvement or conduct may have an adverse effect on the child's best interests because of the existence of the factors which follow:
>
> A long-term and persistent pattern of dishonesty, fraudulent actions, financial exploitation and other such misconduct which not only operates as a poor parental example but which has also endangered this child's health on at least one occasion. Specifically, the mother fraudulently held herself out as a registered nurse when she had not completed even high school, and when the child suffered a fractured skull she removed the child from the hospital, representing that she could monitor his recovery, when she had neither the experience or the knowledge of what to observe. Additionally, the mother married the father when she had a prior undissolved marriage. She financially exploited both of these husbands. She has fabricated medical problems to get attention and sympathy. She has an ability to make a very "personable" first impression which is used, however, to

> manipulate others and get what she wants, without regard to whether it
> would be in the best interests of the child.

CP at 26.

Ms. Belton challenges this restriction, focusing on what she claims is the absence of a required nexus between her history and the adverse effect on Dennis that concerned the trial court. The requirement of a "nexus" was first discussed in *In re Marriage of Watson*, 132 Wn. App. 222, 234, 130 P.3d 915 (2006) (stating that "[i]n the absence of substantial evidence establishing a nexus" between a restricted parent's conduct and the adverse effect that concerns the court, a trial court errs in imposing restrictions). She also emphasizes the initial report filed by Ms. Coufal rather than the evidence presented at the two-day trial.

In matters dealing with the welfare of children, trial courts are given broad discretion. *In re Marriage of Cabalquinto*, 100 Wn.2d 325, 327, 669 P.2d 886 (1983). The court's discretion must be guided by the provisions of the Parenting Act of 1987, chapter 26.09 RCW. *In re Marriage of Katare*, 175 Wn.2d 23, 36, 283 P.3d 546 (2012), *cert. denied*, 133 S. Ct. 889 (2013). An appellate court may not substitute its findings for the trial court's with respect to placement of children when ample evidence supports the trial court's determination. *In re Marriage of Kovacs*, 121 Wn.2d 795, 810, 854 P.2d 629 (1993) (citing *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959)).

In fashioning a permanent parenting plan, the trial court seeks to maintain the child's emotional stability, to clearly establish the parents' responsibilities, and to minimize the child's exposure to harmful parental conflict. RCW 26.09.184(1)(b), (d), (e). Each case must be decided on its own facts, as every child is different. *In re Marriage of Jensen-Branch*, 78 Wn. App. 482, 491, 899 P.2d 803 (1995). The primary concern of the courts in custody matters is always the welfare of the child. *In re Rankin*, 76 Wn.2d 533, 537, 458 P.2d 176 (1969).

Restrictions on parental involvement are warranted when substantial evidence demonstrates that a restrictive factor makes unrestricted involvement or conduct with the children likely to adversely affect them. *Watson*, 132 Wn. App. at 233. Findings of actual or potential harm must be made with reference to specific evidence "as opposed to general findings of harm which leave an appellate court searching the record for evidence that may or may not have been seen as pivotal or relevant by the trial court." *Jensen-Branch*, 78 Wn. App. at 491-92. However, a trial court does not need to wait for actual harm to occur before imposing restrictions on visitation. *In re Marriage of Burrill*, 113 Wn. App. 863, 872, 56 P.3d 993 (2002). "Rather, the required showing is that a danger of . . . damage exists." *Id.*

In *In re Marriage of Wicklund*, 84 Wn. App. 763, 932 P.2d 652 (1996) and *Watson*, the appellate courts overturned restrictions imposed on the authority of RCW 26.09.191 for lack of the required nexus. In *Wicklund*, the trial court restricted the ability

of the father, a gay man, to display affection toward his partner in front of his children because the children were having difficulty adjusting to his homosexuality. 84 Wn. App. at 769. The Court of Appeals reversed the trial court, holding that the restrictions were an abuse of discretion because "[p]roblems with adjustment are the normal response to any breakup of a family. . . . If the problem is adjustment, the remedy is counseling." *Id.* at 771.

In *Watson*, the trial court imposed restrictions on a father's visitation time based solely on the mother's allegation that he had abused their daughter, an allegation that the trial court found was not proved. The Court of Appeals reversed the trial court because "the unproven allegation of sexual abuse [did] not provide substantial evidence in support of the visitation restrictions" and the remaining evidence weighed in favor of the father. *Watson*, 132 Wn. App. at 233.

Addressing both *Wicklund* and *Watson*, the Washington Supreme Court's recent decision in *Katare* found that *Wicklund* and *Watson* do not require that a harm be "likely" before visitation can be limited. Rather, "restrictions cannot be imposed for unfounded reasons." *Katare*, 175 Wn.2d at 37.

Ms. Belton contends restrictions on her decision making and residential schedule were improperly imposed because the trial court's finding amounts to only a "suggestion of adversity" that is "equivocal at best." Br. of Appellant at (unnumbered) 12 (emphasis

8

omitted). She further argues that by stating only that her conduct "'may' [have] 'an adverse effect'" the finding does not satisfy the requirement that it be "'express.'" *Id.*

Addressing the latter point first, the trial court's finding that the conduct "may have an adverse effect" directly tracks the language of RCW 26.09.191(3). Given the introductory language of the subsection, a finding by the trial court that a factor or conduct "may have an adverse effect on the child's best interests" is equivalent to a finding that the factor or conduct is "adverse to the best interests of the child." Otherwise, a factor or conduct under (g) would have to present more danger than any of the other factors or conduct under subsection (3). The requirement that the trial court "expressly find" the factor to be adverse to the child's best interests is satisfied where it sets forth the factor in express terms in the parenting plan, available for our review. The trial court made an express finding here.

The trial court's restriction was not imposed for an unfounded reason. The mother's long-term pattern and persistent pattern of dishonesty, fraudulent actions, and financial exploitation provide a foundation for the trial court's conclusion that she is a poor parental example and is likely to endanger Dennis's emotional well being and psychological development as time passes, even if he has not yet experienced the full effects that concerned the court. He was, after all, only 15 months old at the time of trial and had been under his mother's primary care for only the first 5½ months of his life. The concerns for Dennis's well-being were borne out once already, when Ms. Belton

9

removed him from the hospital where he was being treated for a fractured skull by falsely representing that she was qualified to monitor his recovery. Ms. Coufal testified that it was hard to trust Ms. Belton "because of the things she has said in the past that are blatant lies." Report of Proceedings (RP) at 22. Ms. Belton's older son expressed reservations about her having primary care of his half-siblings. That evidence and the evidence of problems and burdens that Ms. Belton had left in her wake in prior years (significant financial exploitation of two husbands, broken relationships, lost employment based on misrepresentations, and unwarranted concern and medical expense inflicted on others by her hypochondriasis or attention-seeking behavior) sufficed.

Ms. Belton insists that Mr. Leslie's account of the parties' marriage and conduct was rife with inaccuracies and lies. This court cannot retry the facts on appeal, and will defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence and credibility of the witnesses. *Burrill*, 113 Wn. App. at 868. The trial court found Mr. Leslie and his witnesses to be credible. After hearing from all of the witnesses, the trial court observed, "This testimony that I heard about Ms. [Belton] and her actions over the course of years, was a mind boggler. I've rarely met someone who was so...described as so dishonest and manipulative." RP at 420 (second alteration in original).

Substantial evidence supported the trial court's finding of a factor warranting restrictions on Ms. Belton under the parenting plan.

II

Ms. Belton next asserts that the trial court committed reversible error and abused

its discretion by allocating decision making and residential time without examining

required statutory factors and making specific.findings of fact as to each.

We first address the trial court's allocation of decision making authority. RCW

26.09.187(2)(b) requires that a trial court order sole decision making when it finds that

(1) a limitation on the other parent's decision making is mandated by RCW 26.09.191;

(2) both parents are opposed to mutual decision making; or (3) one parent is opposed to

mutual decision making, and the opposition is reasonably based on criteria set forth in the

statute.

The trial court explained its award of sole decision making authority to Mr. Leslie

as follows:

> One parent is opposed to mutual decision making, and such opposition is
> reasonably based on the following criteria:
>
> (a)    The existence of a limitation under RCW 26.09.191 . . .
>
> (b)    The history of participation of each parent in decision making
> in each of the areas in RCW 26.09.184(4)(a) (here, mother
> has abused her unilateral decision-making in the past,
> endangering the child); and
>
> (c)    Whether the parents have demonstrated ability and desire to
> cooperate with one another in decision making in each of the
> areas in RCW 26.09.184(4)(a) (the father cannot trust the
> mother to make decisions that are based upon the child's best
> interests because of her inability to be honest with him and
> with others).

CP at 31.[3]

Ms. Belton first argues that the court's error in finding a basis for restriction under RCW 26.09.191 carries over to create error here as well. We have already rejected that argument.

She alternatively argues that the record does not support the statutory criteria that the court relied upon as making Mr. Leslie's opposition to mutual decision making reasonable. According to her, no evidence suggests that she "'abused her unilateral decision making in the past'" (recognized as a reasonable basis for sole decision making by RCW 26.09.187(2)(b)(ii)) or "'failed to demonstrate her ability or desire to cooperate in the decision-making process'" with Mr. Leslie (recognized as a reasonable basis by RCW 26.09.187(2)(b)(iii)). Br. of Appellant at (unnumbered) 14.

Mr. Leslie's testimony, together with the evidence of Ms. Belton's decision to remove Dennis prematurely from the hospital following his skull fracture, provide support for the criteria found by the trial court. Mr. Leslie testified that he wanted decision making for himself. He went on to discuss his difficulties in trying to co-parent with Ms. Belton, his concern about her decision making ability, and her inability to be honest. While Ms. Belton disagrees, we defer to the trial court to resolve conflicting

---

[3] In citing the criteria that made Mr. Leslie's opposition to mutual decision making reasonable, the court's finding refers, in error, to RCW 26.09.184(4)(a). Its narrative makes it clear that it was relying on RCW 26.09.187(2)(b)(ii) and (b)(iii).

testimony by evaluating the persuasiveness of the evidence and credibility of the witnesses. Substantial evidence established the statutory criteria for sole decision making relied upon by the court.

Turning to the residential provisions of the parenting plan, RCW 26.09.187(3) sets out seven factors that ordinarily are to guide the allocation of parents' residential time.[4] The trial court did not address the factors in the parenting plan or speak specifically to them in its oral decision. Ms. Belton argues that this is reversible error. Mr. Leslie responds that the trial court's consideration of the seven factors was made unnecessary by its finding of a basis for restriction under RCW 26.09.191.

RCW 26.09.187(3)(a) provides that the seven factors apply in any case "[w]here the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule." Mr. Leslie's position is that the limitations of RCW 26.09.191 were dispositive here. Ms. Belton replies that Mr. Leslie has not pointed to any legal authority for his position and

---

[4] The factors are: the relative strength, nature, and stability of the child's relationship with each parent; the agreements of the parties, provided that they were entered into knowingly and voluntarily; each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child; the emotional needs and developmental level of the child; the child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities; the wishes of the parents and the wishes of the child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and each parent's employment schedule. RCW 26.09.187(3)(a).

we should not consider it—but he cites the statute, which is legal authority. Neither party cites any reported decision addressing when the finding of a restriction under RCW 26.09.191 is "dispositive of the child's residential schedule," nor have we been able to find one.

Clearly the fact that the trial court found a basis for restriction is relevant to its obligation to consider the subsection .187 factors. RCW 26.09.184(6) ("Residential Provisions for the Child") provides that "[t]he [parenting] plan shall include a residential schedule . . . consistent with the criteria in RCW 26.09.187 and *26.09.191.*" (Emphasis added.) As noted, RCW 26.09.187(3) ("Residential Provisions") provides in part, at subsection (a), that "[t]he child's residential schedule *shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule*, the court shall consider the following factors: . . ." (Emphasis added.) Both of these provisions refer to RCW 26.09.191 in its entirety, thereby including RCW 26.09.191(3)(g). And RCW 26.09.191(3) authorizes a trial court that finds a factor justifying restriction to "preclude or limit any provisions of the parenting plan."

The trial court considered and commented on the guardian ad litem's and other witnesses' testimony as to the parents' care giving. It made the following observations in its oral ruling:

14

I will be obviously making Mr. Leslie the primary residential parent under the parenting plan. I think the fewer transfers of this child the better, but I think that...that...that the...fact is, that the less exposure [he] has to his mother for long periods of time, the less the danger is that he's gonna take on to himself the kind of moral fiber, or lack thereof that Ms. [Belton] has. By the same token, it sounds as i[f] her older son has his own moral compass and...which is fortunate, and he's decided—by the testimony I heard, decided to...extricate himself from a relationship with his mother, because it has come to his attention how dishonest she is and has been. It's really...I can't imagine a child being raised by a parent with the kind of ...manipulation and ...lack of morality that Ms. [Belton] has displayed. When I say morality I mean, lack of common decency toward those that you are trying to be the closest to. Let alone people at large, such as employers. So, I can't imagine what it must be like being a little kid growing up in that environment, and as a result I think it is important for this court to limit the opportunities of this parent, Ms. [Belton], to instill those kinds of values. I don't think she would do it intentionally, but I think she would do it by example, and not even know that she's doing it because she's so used to doing it, and so used to using others for her own gain and her own benefit, and her own whim, can't help but observe that if you're a child in that...in that home. But, I think that even the most disordered parent, some exposure by the child to the parent is important and some relationship is important as long as the court or the parent on the other end can protect the child some from the damage that can be done by that. So, I will be adopting Mr. Leslie's proposed residential schedule for now.

RP at 423-24 (most alterations in original).

We conclude that where a trial court is authorized to "preclude or limit any provisions of the parenting plan" on the basis of a well-founded restriction, it is inherent in the trial court's authority to decide that a restriction is dispositive. It is illogical for Ms. Belton to suggest that the same trial court, relying on the same evidence, could arrive at one residential plan as appropriate in light of its restriction and a different one by going through a separate exercise of applying the seven factors. Here, Ms. Belton has not

15

identified any subsection .187 factor that, when considered alongside the trial court's oral ruling and findings, gives rise to a concern that it was never considered by the trial court. She simply points to the trial court's failure to go through the exercise of expressly considering each factor on the record. Given the trial court's finding of a restriction, its oral ruling and findings are sufficient. *And see In re Marriage of Croley*, 91 Wn.2d 288, 291-92, 588 P.2d 738 (1978) (we presume that the trial court considered the statutory elements as long as the record shows that it reviewed evidence on each factor).[5]

## III

Finally, Ms. Belton argues that the final order of child support must be reversed on the basis of her two claims of error or abuse of discretion addressed above. No new or different argument of error in the fixing of child support is made. We have rejected Ms. Belton's other arguments of error, thereby disposing of this third challenge as well.

## IV

Mr. Leslie seeks attorney fees on appeal. He does not cite a statutory basis for an award of fees. RCW 26.09.140 provides that we may award reasonable attorney fees and costs of defending any proceeding under chapter 26.09 RCW. To do so, we must consider the needs of the requesting party and the other party's ability to pay. RCW 26.09.140; *In re Marriage of Robertson*, 113 Wn. App. 711, 716, 54 P.3d 708 (2002).

---

[5] *Croley* addressed RCW 26.09.187's predecessor, former RCW 26.09.190 (1973), which the legislature repealed in 1987. *See* LAWS OF 1987, ch. 460, § 61.

16

Mr. Leslie has not shown his need or Ms. Belton's ability to pay. The request for

attorney fees on appeal is denied.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the

Washington Appellate Reports but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Brown, J.