[No. 45338-6-I. Division One. October 2, 2000.]

SUSAN SCHRAGER REDDY, *Appellant*, v. ELENA SERRANO KARR, ET AL., *Respondents*.

---

[17] Depending upon the terms of the policies, these costs may also include expenses for defense.

*Joseph A. Shaub*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *John W. Cobb, Deputy*; and *Miles A. Yanick*, for respondents.

KENNEDY, J. — Chapter 26.12 RCW authorizes superior courts to appoint family court investigators to assist in carrying on the work of the family court. Family court investigators, who are appointed by the court, and who serve at the pleasure of the court, perform court-ordered parenting evaluations in order to assist the court in developing such orders as the court deems necessary regarding parenting plans for minor children whose parents are becoming divorced. We hold that family court investigators performing court-ordered parenting evaluations act as an arm of the court and accordingly are entitled to quasi-judicial immunity from civil liability for acts undertaken in performing such parenting evaluations. Accordingly, the trial court did not err in dismissing Susan Reddy's complaint in which she alleged that Elena Serrano Karr, an investigator of King County Family Court Services, performed a negligent parenting evaluation. Karr's quasi-judicial immunity extends to King County Family Court Services (FCS). Accordingly, the trial court did not err in dismissing Reddy's claim against FCS for alleged negligent training and supervision of Karr. We affirm.

## FACTS

The material facts in this case are uncontested. Susan and Steven Reddy were married in 1993, and they had one son, Kalen, in 1994. In November of 1997, while residing in Seattle, the Reddys separated and their son remained with Susan. In January 1998, Susan took Kalen to Florida. After they had been in Florida for three weeks, Susan informed Steven that she and Kalen were not coming back to Seattle. Steven subsequently filed a petition for dissolution in King County seeking to be named Kalen's primary residential parent.

On March 18, 1998, the presiding superior court commissioner ordered that Kalen be returned to Seattle to live with his father from April 15, 1998 until the next hearing on May 11, 1998. The court also ordered a division of the social services department of the King County Superior Court to conduct an investigation and evaluation on the issue of who should be the primary residential parent. The evaluation was assigned as an out-of-county request for services, which meant that it was a one-party evaluation regarding Steven Reddy only.

FCS assigned the case to social worker Elena Serrano Karr, MSW. Karr interviewed Steven Reddy and observed him with his son. She also reviewed declarations from friends and family members of both parties, and she interviewed day care and preschool teachers, two therapists whom the parties had seen, and (pursuant to a release signed by both parties) Laura Lavi, who had served as a mediator for the Reddys early in their separation. Karr also reviewed and submitted the report of a guardian ad litem (GAL) from Florida who conducted an investigation of Susan Reddy. Karr spent approximately 23 hours investigating this case and drafting her evaluation.

On May 4, 1998, Karr submitted her evaluation to the court. Karr's evaluation details Steven Reddy's version of the marital breakdown. Karr reported that Steven claimed that Susan had a drinking problem. Karr described Steven and Kalen's relationship as positive, and she stated that the boy "does not appear to be emotionally affected by the separation from his mother." Clerk's Papers at 20. Karr also reported that the parties' former therapist Ellen Fox considered Susan Reddy to be the more competent parent because Fox viewed Steven as "irresponsible financially, very critical of Susan, and not as engaged with the child as Susan." Clerk's Papers at 22. Karr also spoke to another former therapist of the parties, Joyce Victor. According to Karr, Victor described the Reddys as highly embattled for many reasons, including allegations regarding Susan's alcohol consumption.

Prior to speaking with mediator Lara Lavi, Karr faxed a release signed by the parties to Lavi's office, which authorized Lavi to speak about the case. Karr confirmed that the release was received by Lavi's office, but Karr did not know that Lavi was unaware of the release when they spoke. When they spoke, Lavi requested that most of her comments remain off the record. Karr did not inform Lavi that a release had been signed. In her evaluation, Karr reported that Lavi would state only that she was aware of domestic violence allegations by both parties, but had no firsthand knowledge of the subject.

Finally, during Karr's investigation, Steven Reddy taped a phone conversation between Susan and their son without Susan's permission or knowledge. Steven gave the tape to Karr; she had it transcribed, and she submitted the transcript as part of her evaluation stating that it had influenced her recommendation. In part of the taped conversation, Susan became emotionally upset when her son stated that he had spent time with a woman Steven was personally involved with. The transcript shows that Kalen responded to his mother's reaction by crying and telling her that she hurt his feelings. Karr stated in her evaluation that the tape shows Susan Reddy being "emotionally abusive." Clerk's Papers at 25.

Karr ultimately recommended that Steven Reddy be designated the primary residential parent. Karr also recommended that the parties complete parent education training assessment, that counseling be obtained for their son, and that Susan Reddy complete a full drug and alcohol assessment.

On May 9, 1998, after reading Karr's evaluation, Lavi submitted a declaration to the court for consideration at the May 11, 1998 hearing. In her declaration, Lavi referred to her observations of the parties while she served as the parties' mediator, which took place over several months and consisted of numerous in-person meetings and phone calls. Lavi observed Steven to be extremely hostile towards Susan and towards the mediation process. Lavi stated that

she found Susan to be the more mature, stable and responsible parent and that she did not observe any evidence that Susan suffered from alcoholism. Lavi opined that Karr was completely biased in favor of Steven and had failed to spend sufficient time with Kalen to form a legitimate judgment regarding the child's mental state or best interests. Finally Lavi recommended that the court appoint a GAL to further investigate the case.

At the May 11, 1998 hearing, the court appointed a GAL to prepare a more detailed report. The court also ordered that Kalen remain with his father pending the submission of the GAL's report.

On August 17, 1998, the GAL submitted a lengthy and detailed report to the court. The GAL recommended that Susan Reddy should be made the primary residential parent. The court subsequently entered a final parenting plan making Susan Reddy the primary residential parent.

On September 8, 1998, Susan Reddy filed a complaint for damages in King County Superior Court alleging, inter alia, that she suffered monetary and emotional damages due to negligence by Karr and negligent supervision of Karr by FCS. On September 16, 1999, the court granted the defendants' motion for summary judgment dismissing Susan Reddy's claims. Susan Reddy timely appealed.

## DISCUSSION

### Standard of Review

■ When we review a summary judgment order, we undertake the same inquiry as the trial court. *Mountain Park Homeowners Ass'n. v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). We determine whether any genuine issues of material fact exist and if the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts and reasonable inferences from facts in the light most favorable to the nonmoving party. *Tydings*, 125 Wn.2d at 341.

## Liability of FCS Caseworker

■ ■ Susan Reddy contends that Karr is liable for her alleged negligence in conducting her investigation and evaluation. The defendants disagree, arguing that Karr is immune from suit on the basis of quasi-judicial immunity. Quasi-judicial immunity "attaches to persons or entities who perform functions that are so comparable to those performed by judges that it is felt they should share the judge's absolute immunity while carrying out those functions." *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 99, 829 P.2d 746 (1992).

Quasi-judicial immunity is designed to protect the government, not the individual employee, from suit. The doctrine of exemption of judicial and quasi-judicial officers is founded upon a sound public policy, not for the protection of the officers, but for the protection of the public, and to ensure active and independent action by individuals charged with fashioning judicial determinations. *See Anderson v. Manley*, 181 Wash. 327, 331, 43 P.2d 39 (1935); *see also Taggart v. State*, 118 Wn.2d 195, 203, 822 P.2d 243 (1992) (the purpose of judicial immunity is not to protect judges as individuals but to safeguard the independence of the judiciary) (citing *Adkins v. Clark County*, 105 Wn.2d 675, 677, 717 P.2d 275 (1986)).

These principles have been applied to protect parole officers and guardians ad litem from suits stemming from their recommendations to courts. For example, in *Taggart*, the court held that parole officers are entitled to quasi-judicial immunity "for those functions they perform that are an integral part of a judicial or quasi-judicial proceeding." *Taggart*, 118 Wn.2d at 213. The court explained that quasi-judicial immunity was appropriate "when a parole officer performs functions such as . . . providing the [Parole] Board with a report to assist the Board in determining whether to grant parole[.]" *Id.*

Likewise, in *Barr v. Day*, 124 Wn.2d 318, 879 P.2d 912 (1994), the court held that guardians ad litem in guardianship proceedings involving court approval of settlements of

civil claims of incompetents act as an arm of the court, and are, therefore, entitled to quasi-judicial immunity from civil liability. *Id.* at 331-32; *see also Adkins*, 105 Wn.2d at 677-78 (bailiff acting as an arm of the court during trial and therefore is protected by judicial immunity).

■ Similarly, Karr was ordered by the court to do an investigation and prepare an evaluation to assist the court in determining who should be the child's primary residential parent. RCW 26.12.050(1) authorizes the superior courts to appoint investigators and other personnel that the court finds necessary to carry on the work of the family court. The work of the court includes the full jurisdiction and responsibility to make temporary and permanent orders regarding parenting plans. RCW 26.12.190(1). Family court investigators and evaluators assist the court to develop such orders as the court deems necessary to resolve parenting controversies between divorcing parents. RCW 26.12.190(2). These investigators and evaluators are appointed by and serve at the pleasure of the court. RCW 26.12.050(3). When performing court-ordered functions, these investigators and evaluators act as an arm of the court. Courts have the grave obligation to serve the best interests of minor children of divorcing parents with respect to where the child shall primarily reside and other issues of great importance to the child, its parents and society as a whole. Courts do not ordinarily perform independent investigations; rather the adversary system of justice ordinarily requires that parties to litigation investigate and present evidence from which the court finds facts and applies legal principles in order to resolve controversies. But the unique obligation of courts to serve the best interests of minor children in cases of divorce often requires independent investigations of allegations between warring parents, professional evaluation of parenting abilities, determination of the degree of bonding between children and each parent—not to mention the wisdom of Solomon when the most expedient solution might appear to be to "saw the baby in half." Judges cannot personally perform these

independent investigations and evaluations, due not only to the volume of cases but also to the impropriety of ex parte contact between judges, parties and witnesses. Accordingly, a surrogate is necessary. Family court investigators and evaluators performing court-ordered services do so as surrogates for the court.

Here, similarly to the situations in *Taggart* and *Barr*, Karr did not have any independent decision-making authority over the parties. The court was solely responsible for fashioning the orders under which Steven Reddy was granted temporary residential care of Kalen pending the final parenting plan order. Accordingly, *Taggart* and *Barr* are analogous to the instant case and, as in those cases, quasi-judicial immunity is appropriate.

Nonetheless, Susan Reddy cites *Babcock v. State*, 116 Wn.2d 596, 809 P.2d 143 (1991), and *Gilliam v. Department of Social & Health Services*, 89 Wn. App. 569, 950 P.2d 20, *review denied*, 135 Wn.2d 1015 (1998), in support of her argument that Karr is not entitled to quasi-judicial immunity. However, those cases are distinguishable from this case because they did not involve conduct performed as an integral part of a judicial proceeding. Rather, both *Babcock* and *Gilliam* involved extrajudicial acts by the Department of Social and Health Services (DSHS) performed pursuant to that agency's statutory powers.

In contrast to the DSHS, FCS is a division of the King County Superior Court and its caseworkers' duties are explicitly defined by the individual court orders that initiate each FCS investigation. The FCS investigator's role is defined in the FCS Standards of Practice and Procedures Manual: "[T]he evaluator is charged with the responsibility of providing information and making recommendations to the Court on the issues ordered by the Court. It is not the role or the responsibility of the evaluator to decide the case[.]" Clerk's Papers at 179. Unlike a DSHS caseworker, Karr had no capacity to effect her recommendations. The sole responsibility for the court's orders in this case lie with the court.

Finally, Reddy asserts on policy grounds that denial of relief under the doctrine of quasi-judicial immunity is not appropriate because there are no alternative safeguards to assure against the harms alleged. This argument fails. As illustrated by the facts in this case, the courts are not a rubber stamp for the investigator's report and evaluation. Courts routinely utilize family court investigators but nevertheless retain and exercise sole decision-making authority in matters relating to the best interests of minor children of divorcing parents. Here, the court was not satisfied with Karr's evaluation and appointed a GAL to perform a more thorough investigation. Policy grounds do not dictate abrogation of quasi-judicial immunity for family court investigators performing court-ordered parenting evaluations.

Liability of King County Family Court Services

 Susan Reddy also contends that the trial court erred in dismissing her negligent supervision claim against FCS. FCS contends that summary judgment dismissal of that claim was proper because Karr's quasi-judicial immunity extends to FCS. The basic rule of vicarious quasi-judicial immunity is that a county "which employs an officer also enjoys the quasi-judicial immunity of that officer for the acts of that officer". *See Lutheran Day Care*, 119 Wn.2d at 101. This is because

> [t]he public policy which requires immunity for the [individual officer] also requires immunity for both the state and the county for acts of judicial and quasi-judicial officers in the performance of the duties which rest upon them; otherwise, the objectives sought by immunity to the individual officers would be seriously impaired or destroyed. If the [officer] must weigh the possibility of precipitating tort litigation involving the county and the state against his action in any . . . case, his freedom and independence in proceeding . . . will be at an end.

*Creelman v. Svenning*, 67 Wn.2d 882, 885, 410 P.2d 606 (1966).

Susan Reddy nonetheless cites *Lutheran Day Care* for the proposition that it *"explicitly* holds that an employee's

immunity does *not* extend to the employer." Appellant's Br. at 29. That reading is mistaken. The Court in *Lutheran Day Care* examined whether RCW 64.40.020, which explicitly provides a cause of action against local land use permitting agencies, abrogated the vicarious quasi-judicial immunity that the agency would otherwise enjoy through its individual employee under common law. *Lutheran Day Care*, 119 Wn.2d at 101. The Court first recognized the general rule stated in *Creelman* that "a city, county, or state which employs an officer also enjoys the quasi-judicial immunity of that officer[.]" *Id*. The Court then asked "whether [RCW 64.40.020] was intended to change the *Creelman* rule of imputed municipal immunity" in the context of challenges to land use decisions under the statute. *Id*. The *Lutheran Day Care* Court concluded "that RCW 64.40.020 evidences a legislative intent to abrogate the *Creelman* rule of vicarious municipal immunity for the quasi-judicial acts of its officials" in the limited context of claims brought pursuant to that statute. *Id*. at 103. As such, *Lutheran Day Care* does not undermine the general rule of imputed immunity at issue here. This is not a land use appeal, and there is nothing to suggest that the Legislature's abrogation of vicarious quasi-judicial immunity in RCW 64.40.020 was intended to change the long-standing common law of this State in other areas of the law.

The issue of vicarious quasi-judicial immunity is also addressed in *Dutton v. Washington Physicians Health Program*, 87 Wn. App. 614, 619, 943 P.2d 298 (1997). In *Dutton*, a physician who had been suspended from practice of medicine sued the State, the State Medical Disciplinary Board, the physicians health program, and individuals affiliated with those entities. This court affirmed the Superior Court dismissal on summary judgment, holding that the Board and those associated with it were protected by common-law quasi-judicial immunity, and that quasi-judicial immunity extended to the State and the Board. *Id*. at 619 (citing *Lutheran Day Care*, 119 Wn.2d at 126-27 (citing *Creelman*, 67 Wn.2d at 885); *Savage v. State*, 127 Wn.2d

434, 442, 899 P.2d 1270 (1995) (policy justifies extension of quasi-judicial immunity from an agent to the State).

Susan Reddy fails to show any reason why this case should not be governed by the general rule that a public employee's quasi-judicial immunity extends to the employee's government employer. Moreover, to the extent that FCS may have negligently supervised Karr as alleged by Reddy, FCS is itself an arm of the court. Its personnel are appointed by the court and serve at the pleasure of the court for the sole purpose of assisting the court in carrying out its family court functions. This suit arises out of alleged misconduct by Karr, and, as stated above, her conduct is shielded from liability because her actions in this case were conducted as an arm of the court. Likewise, FCS is shielded as it is a division of the King County Superior Court and its contribution to Karr's conduct occurred pursuant to its mandate from the court. Therefore, under the principles stated in *Creelman, Lutheran Day Care* and *Dutton,* the trial court properly dismissed the negligent supervision claim against FCS due to its vicarious quasi-judicial immunity.

In sum, we find that Susan Reddy's claims against Karr and FCS were properly dismissed because the defendants are shielded from liability under the doctrine of quasi-judicial immunity. This decision makes it unnecessary for us to consider alternative bases for immunity raised by the defendants and to address the question of whether Reddy could establish proximate cause if quasi-judicial immunity were not applicable as a matter of law.

We affirm.

AGID, C.J., and BECKER, J., concur.