This opinion was filed for record
at 8:00 am on April 6, 2017

Er. L. Le

for SUSAN L. CARLSON
SUPREME COURT CLERK

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE APR 0 6 2017

CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In re the Marriage of:

RACHELLE K. BLACK,

              Petitioner,

and

CHARLES W. BLACK,

              Respondent.

No. 92994-7

EN BANC

Filed      APR 0 6 2017

FAIRHURST, C.J.—Rachelle and Charles Black were married for nearly 20 years and have three sons. They raised their children in a conservative Christian church and sent them to private, Christian schools. In 2011, Rachelle[1] told Charles that she is a lesbian. In the order of dissolution, the trial court designated Charles as the primary residential parent. The final parenting plan also awarded Charles sole decision-making authority regarding the children's education and religious upbringing. But the record shows that the trial court considered Rachelle's sexual orientation as a factor when it fashioned the final parenting plan. Further, improper

---

[1] To avoid confusion, we refer to the parties by their first names. We intend no disrespect.

bias influenced the proceedings. This bias casts doubt on the trial court's entire ruling, and we are not confident the trial court ensured a fair proceeding by maintaining a neutral attitude regarding Rachelle's sexual orientation. Accordingly, we reverse.

## I. FACTS AND PROCEDURAL HISTORY

Rachelle and Charles Black married in July 1994. When they married, Rachelle and Charles were 19 and 21 years old, respectively. Both Rachelle and Charles worked for Rachelle's parents at the parents' business. When Rachelle and Charles had their first child in 1999, they agreed Rachelle would stop working and be a stay-at-home parent while Charles continued to work. Rachelle and Charles have three sons together, ages 17, 14, and 9.[2] At the time of trial, they lived near Graham, Washington. For most of their marriage, Rachelle was the primary caretaker of the children, and Charles was the primary wage earner.

The Blacks' Christian background was prominent at trial. Rachelle, Charles, and the children attended a "conservative Christian" church. Clerk's Papers (CP) at 73. Rachelle's parents are elders at the church, and Rachelle had been attending the church for most of her life. Kelly Theriot Leblanc, the guardian ad litem (GAL)

---

[2] These are their current ages. At trial, the children were 15, 12, and 7 years old, respectively.

2

assigned to this case, testified that the "family attends a church where the teachings are that homosexuality is a sin." 1 Report of Proceedings (RP) at 36.

Consistent with their beliefs, Rachelle and Charles agreed to send their three children to small, private, Christian schools in the Tacoma area. Charles testified they chose the schools mainly because of their faith-based teaching: "They believe in the Bible, they follow the Bible, read the Bible. They try to put it in practice. You know, love the sinner, hate the sin, a lot of that." 2 RP at 289. Jennifer Knight, the children's therapist, described their upbringing as "a very dogmatic fundamentalist situation, both at school and at home." 2 RP at 350.

In December 2011, Rachelle told Charles that she believed she might be "'gay.'" 3 RP at 409. Charles "told [Rachelle] to go and explore and figure out what [she] needed to figure out." *Id.*

Rachelle's recognition of her sexual orientation altered the status quo at the Black household, and trying to maintain the status quo for the sake of the children became increasingly difficult. Although Rachelle and Charles continued to live in the same house, Rachelle began sleeping in a basement room after Charles allegedly sexually assaulted her, which he denies, and after he told friends, family, and church members about her sexual orientation without her permission. Rachelle stopped attending the family church, while Charles and the children continued to attend. Around the same time, Rachelle began a romantic relationship with a woman and

3

began spending more time away from home. Rachelle testified that she tried "not to be gone more than one night a week." 1 RP at 113. Rachelle noted that Charles was also gone from the home at times during this period, but she admitted that she was gone more than he was.[3]

Charles took on more parenting responsibilities than he had in the past. For example, he received permission from his employers (Rachelle's parents) to adjust his work schedule so that he could leave work before the children were released from school. Charles testified that he typically drove their oldest son to the bus stop every morning and picked up the other children from school in the afternoon. Although Rachelle still typically cooked dinner, she and Charles split other household duties like cleaning, laundry, and grocery shopping. Rachelle believed Charles' increased participation in household duties was intended to undermine her relationship with the children.[4]

In May 2013, Rachelle filed for dissolution. The trial occurred in August 2014, nearly three years after Rachelle first told Charles about her sexual orientation.

---

[3] Charles kept a record on a calendar of when Rachelle was absent from the home, and Rachelle alleges he monitored her computer use and e-mail. Rachelle made notations on a copy of Charles' calendar noting the alleged absences that she disputes.

[4] "He started stepping on my toes as far as household things go that have always been my job and my domain; the laundry, the cleaning, that kind of stuff. I can't leave a half load of laundry alone. If I leave a half load of laundry in front of the washing machine it's done, and it just feels intrusive. These are my jobs that I've had for 15 years, and they're being taken over without my need or consent." 1 RP at 175-76.

4

In addition to Rachelle and Charles, the main witnesses at trial were Knight (the children's therapist) and Leblanc (the GAL).

Knight observed the children during 11 appointments between January and July 2014. Knight described the children as "very sheltered" and said that "they don't really have a grasp of what's going on in the real world." 2 RP at 346-47. For example, "they're uncomfortable talking about evolution." 2 RP at 347. Knight believed a transition from the children's "sheltered school" to a public school district would be a struggle because public schools are "very worldly compared to these children." 2 RP at 347-48. Knight believed that from a therapeutic perspective, "the less change that these children have to deal with[,] the better." 2 RP at 348.

Because Rachelle and Charles had not disclosed Rachelle's sexual orientation to their children, Knight was the first person to tell them that their mother is gay. Knight testified that the 15 year old at the time, was "flat" upon hearing the news, and Knight thought he "was still processing it," 2 RP at 349; that the 12 year old "snuggled up to his mom kind of indicating, you know, I'm going to love you no matter what," *id.*; and that the 7 year old was too young to understand. Knight believed "the children are starting to get more used to the idea that their mother, you know, is in a relationship with a female." 2 RP at 350.

Knight's primary concern was for the children to be in a "stable environment that's going to be stable long term." 2 RP at 352. Due to the children's upbringing,

they did not understand the concept of divorce. Therefore, Rachelle and Charles' separation "is a major change considering the background of these children," and Knight believed the best outcome for the children would be a stable environment that "minimize[s] . . . future changes." *Id.* Knight recommended Rachelle's partner have no contact with the children for the time being.

Knight testified that she believed Charles was the more stable parent. Knight noted that Rachelle was unemployed, did not have a plan for future housing, and relied on her partner for support: "It always makes me nervous when people are relying on another person to provide for them, because there is no assurance that relationships will work . . . . I worry that if that relationship doesn't work out, then the children are going to be displaced again." 2 RP at 352-53. On the other hand, Knight stated that Charles "has a history of employment and being a good provider, so obviously he is a stable parent." 2 RP at 353. She testified that the children "have reported that over the last couple of years they've seen [Rachelle] a lot less and that they have spent more time with their father." 2 RP at 362. Despite "some concern about him not being as active in the past with the children because he was the main provider," the children reported that Charles "has been more part of their daily life" in recent years. 2 RP at 353.

Leblanc, the GAL, shared many of Knight's concerns. Leblanc testified that several "collateral sources" indicated Rachelle had been "absent from the home for

6

long periods of time on a fairly frequent basis for the last two to . . . three years." 1

RP at 16. This was the main reason Leblanc recommended that the trial court

designate Charles as the residential parent:

> [O]ver the last two to three years while things have been going south in the relationship when [Rachelle] was not available and when she was not at home, [Charles] always was. He did not deviate from his participation in school. He has been involved in the medical decisions that were made. He has been available when the school has needed him to respond. He has been present in the home per the reports of the boys, and he's following the direction of the mental health counselor who's trying to help them navigate through all of this.

> So, I stated in my report, I don't think it can be reasonably disputed that [Rachelle] historically occupied a role of primary parent. They did have a traditional relationship where he worked outside the home and she was at home . . . .

> But over the past three years when things did fall apart, she wasn't available to the kids. They perceived that she wasn't available to the kids, and the school notes that she was not available, and [Charles] picked up that slack and covered for it for a very long time. And you've got to be able -- you've got to have some assurance that if things are going to continue to be problematic or hard, which they may be, because there's going to be more changes for these parties. . . . But of the two, [Charles] is employed. He has the ability to support himself. He's not relying on a third person to do that, and right now I just don't know.

1 RP at 75-76.

But Leblanc's recommendation was also based on Rachelle's sexual

orientation, at least insofar as she believed it conflicted with the children's religious

beliefs. In a preliminary report, Leblanc wrote that Rachelle's "lifestyle choice" might cause controversy given the children's background:

> It is significant to note that the children, who have been enrolled in and attending a private Christian school since they each reached school age, have no idea that [Rachelle] now considers herself to be a lesbian. While it is not my intent to cast judgment on [Rachelle's] lifestyle choice, the fact remains that it is a choice that can result in significant controversy. In this instance, the issue has disrupted the marriage and also resulted in difficulty with extended family. Given the family's faith and historical belief system, it is my opinion that the children should be immediately enrolled in counseling. The children are already struggling with the fact that their parents are divorcing and it is difficult to predict how they will react.

Resp't's Sealed Ex. 39, at 7; *see also* Suppl. Br. of Pet'r at 6-7. However, in her final report, Leblanc claimed her use of the word "'choice'" in the preliminary report did not relate to Rachelle's sexual orientation. Resp't's Sealed Ex. 40, at 21.[5] Instead, she explained that Rachelle

> did choose to spend a large majority of her time away from the home over the past three years; did choose to terminate the marriage; and is planning on living with [her partner]. All of those decisions were a matter of choice and all of those choices are inconsistent with teachings and principles that she and [Charles] elected to share with their children. [Rachelle's] choices did disrupt her relationship with the

---

[5] We note that respondent's exhibits 39 and 40 are sealed under GR 22. These exhibits include the preliminary and final reports Leblanc provided to the trial court. Because these reports demonstrate Leblanc's reasoning for her recommendation, we believe it is necessary to rely on certain passages for our decision. In doing so, we have been careful to avoid divulging any sensitive information out of respect for the parties' privacy.

children and given the family's faith and historical belief system, the choices have also created a great deal of controversy and confusion.

*Id.* at 21-22; *see also* Suppl. Br. of Pet'r at 6-7. Leblanc reiterated this point during trial. 1 RP at 43 ("[I]t is certainly not my place to suggest that her gender preference is or isn't a matter of choice. That wasn't my intent when I used the word.").

Leblanc's final report notes that Charles believed Rachelle "is now on a campaign to re-indoctrinate the children" and that "concepts and ideals the children have been taught throughout their lives are being eviscerated." Resp't's Sealed Ex. 40, at 10.[6] Leblanc also suggested the children might experience "bullying" as a result of Rachelle's decision to leave the marriage and begin a relationship with her partner:

> What I'm saying is the choice to leave the marriage when you have three children and then to establish a relationship with a same sex partner when you've had kids raised in a very conservative parochial environment can be very controversial and people can be very mean. . . .
>
> And the reality is that it may happen with some of the children's friends or it may happen with families of the children's friends, and the parties need to be cognizant of that because if it does happen or if there is bullying or if there are comments being made, they need to be able

---

[6] At trial, Leblanc clarified that the "ideals and concepts" she was referring to in her final report were mainly about the institution of marriage. 1 RP at 34-35 ("Divorce is something that these kids really don't have any exposure to.").

9

to approach them and address them responsibly so that they can help their kids.

1 RP at 44-45. Ultimately, Leblanc's final report demonstrates a belief that the children's religious upbringing would hinder their acceptance of Rachelle's new life:

> I understand that [Rachelle] is excited about her relationship and looking forward to moving forward with her life, she doesn't seem to recognize that the children do not necessarily share that perspective. [Rachelle] also seems to forget that she participated in the decision to enroll the boys in a parochial school and helped build the foundation that they have always lived by. Ideas and beliefs that were learned over a lifetime cannot simply be disregarded. [Rachelle] needs to recognize that the children have to be afforded the opportunity to transition at their pace and thus far, I am not confident that she is prepared to let that happen.

Resp't's Sealed Ex. 40, at 24. Consistent with this belief, Leblanc recommended that Charles serve as the primary residential parent. She also recommended that Knight have the discretion to determine when the children may have contact with Rachelle's partner. Leblanc further recommended broad prohibitions on Rachelle's ability to discuss religion and sexual orientation with her children:

> I recommend that [Rachelle] be ordered to refrain from having further conversations with the children regarding religion, homosexuality, or other alternative lifestyle concepts and further, that she be prohibited from exposing the children to literature or electronic media; taking them to movies or events; providing them with symbolic clothing or jewelry; or otherwise engaging in conduct that could reasonably be interpreted as being related to those topics unless the discussion,

conduct, or activity is specifically authorized and approved by Ms. Knight.

*Id.* at 25. Some of these restrictions were recommended in response to Rachelle's parental efforts to explain the circumstances to her children. For example, Rachelle showed her oldest son a video documentary addressing different Christian attitudes toward same-sex relationships after he asked a question about the issue. On another occasion, the second oldest son asked if he could wear a rainbow bracelet Rachelle had with the words "love and pride." 1 RP at 169.

The trial court largely adopted Leblanc's recommendations. On September 2, 2014, the trial court issued a written ruling, which it later expressly incorporated into its findings and conclusions accompanying its dissolution decree and final parenting plan. The trial court entered a finding that Rachelle was "a stay at home Mom prior to 2011." CP at 74. The trial court found that after December 2011, Rachelle spent some time away from home and that Charles took on more parenting responsibilities during this period. The trial court found that Rachelle was away "approximately 20% of the time." CP at 40. Like Leblanc, the trial court concluded that Charles was the more stable parent. The trial court specifically noted the children's religious upbringing and the potential disruption Rachelle's sexual orientation posed to that upbringing:

> Here, [Charles] is clearly the more stable parent in terms of the ability to provide for the needs of these children, both financially as well as emotionally and in maintaining their religious upbringing. These

11

children have been taught from the Bible since age 4. I believe it will be very challenging for them to reconcile their religious upbringing with the changes occurring within their family over issues involving marriage and dissolution, as well as homosexuality.

CP at 40-41.

The trial court designated Charles as the primary residential parent. The trial court also awarded sole decision-making authority regarding the children's religion, education, and day care to Charles. Finally, the trial court denied Rachelle's request for spousal maintenance, finding that Charles was unable to pay. The court also ordered Rachelle to pay the statutory minimum amount of child support. The Court of Appeals, Division Two, affirmed most of these provisions in an unpublished opinion. *In re Marriage of Black*, No. 46788-7-II, slip op. at 1 (Wash. Ct. App. Mar. 8, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%20467887-II%20Unpublished%20Opinion.pdf. However, the Court of Appeals held that the trial court erred when it granted Charles sole decision-making authority regarding religion and when it limited Rachelle's conduct and speech regarding religion and sexual orientation.[7] *Id.* We accepted Rachelle's petition for review.

## II. ISSUES

1. Did the trial court abuse its discretion when it designated Charles as the primary residential parent?

2. Did the trial court abuse its discretion when it awarded Charles sole decision-making authority regarding the children's education?

---

[7] Charles did not seek review on this issue.

12

3. Did the trial court abuse its discretion when it denied Rachelle's request for spousal maintenance?

## III. ANALYSIS

When a trial court fashions a permanent parenting plan, it considers a set of statutory factors aimed at evaluating each parent's abilities, the relationship of each parent to the children, and the children's best interests in light of their needs. *See* RCW 26.09.004(3), .187. Although there are few limits on this analysis, a trial court may not consider a parent's sexual orientation as a factor for custody decisions absent an express showing of harm to the children. *See In re Marriage of Cabalquinto*, 100 Wn.2d 325, 329, 669 P.2d 886 (1983). Applying the relevant statutory factors, the trial court here determined that Charles is the more stable parent. Some evidence supports this conclusion. However, the record in this case supports finding that, but for Rachelle's sexual orientation and the challenge this presented to Charles' religious beliefs, both Rachelle and Charles are capable parents.

The record shows that the trial court considered Rachelle's sexual orientation as the primary reason for concluding that Charles is better suited to address the children's emotional needs and maintain their religious upbringing. Further, Leblanc's report, recommendation, and testimony evinces an impermissible bias against Rachelle due to her sexual orientation. Because the trial court relied heavily

13

on Leblanc, this bias permeated its ruling and casts doubt on the entire parenting plan. We are not confident the trial court here approached the parenting plan with an attitude of neutrality regarding sexual orientation that fairness demands. We therefore reverse and remand for further proceedings.

A.    Standard of review

We review a parenting plan for a manifest abuse of discretion, which occurs when the trial court's "'decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014) (quoting *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012)). We treat the trial court's findings of fact as verities on appeal so long as they are supported by substantial evidence. *Id.* Evidence is "substantial" when it is "sufficient to persuade a fair-minded person of the truth of the matter asserted." *Id.* We do not review the trial court's credibility determinations or weigh conflicting evidence "even though we may disagree with the trial court in either regard." *In re Welfare of Sego*, 82 Wn.2d 736, 740, 513 P.2d 831 (1973).

B.    The trial court abused its discretion when it considered Rachelle's sexual
       orientation as a factor in determining the parenting plan

A trial court abuses its discretion "if it restricts parental rights because the parent is gay or lesbian." *In re Marriage of Wicklund*, 84 Wn. App. 763, 770, 932 P.2d 652 (1996) (citing *Cabalquinto*, 100 Wn.2d at 329). Custody and visitation rights "must be determined with reference to the needs of the child rather than the

14

sexual preferences of the parent." *Cabalquinto*, 100 Wn.2d at 329. In *Cabalquinto*, we held that the trial court's references to a party's sexual orientation required reversal even though the trial court otherwise had tenable grounds for its custody order:

> Ordinarily, with the facts as presented heretofore, we would find no manifest abuse of discretion and would affirm the trial court. . . .
>
> . . . .
>
> In reviewing the entire record before us, we cannot tell what standards of law the trial court followed in reaching its decision on visitation rights. While the findings and conclusions of law suggest the homosexuality of the father was not the determining factor, the unfortunate and unnecessary references by the trial court to homosexuality generally indicate the contrary.

*Id.* at 328.

Charles concedes that custody decisions cannot be based on a parent's sexual orientation absent a showing of harm but nevertheless claims that the trial court here did not find that Rachelle's sexual orientation makes her unfit. Resp't's Resp. to Amici at 5. He argues that *Cabalquinto* is distinguishable because the trial court did not base its ruling on Rachelle's sexual orientation and that the trial court's references to Rachelle's sexual orientation were intended merely to provide context for the separation.

Charles correctly notes that the Court of Appeals upheld a parenting plan under similar circumstances in *Wicklund*. There, the father separated from the mother after learning that he was gay. 84 Wn. App. at 766. The family were active

15

members in the Jehovah's Witnesses faith, which includes a belief that the "'practice of homosexuality is an abomination.'" *Id.* at 769. Evidence in the case included testimony addressing how the children would handle the father's sexual orientation in light of their religious upbringing. *Id.* at 768. The trial court designated the mother as the primary residential parent and implemented a restriction on the father's conduct that prevented him from "'practic[ing] homosexuality'" while the children were with him. *Id.* at 769.

The court struck the restriction on the father's conduct but upheld the residential provisions in the parenting plan. *Id.* at 772-73. Despite the improper restriction on the father's conduct, the court concluded that the record did not demonstrate that the trial court based its decision on the father's sexual orientation:

> Although the trial court's approach to the issue of homosexuality was not neutral—as evidenced by its restrictions on [the father's] conduct—the record does not support [the father's] assertion that the trial court reduced [the father's] residential time solely because of his sexual orientation. . . .
>
> Based on the testimony, the trial court thought the best interests for the children would be served with "as much continuity and as . . . little change in the children's lives" as possible. This is a tenable reason for providing for residential placement with [the mother] during the school week, with alternating weekends with [the father].

*Id.* (fifth alteration in original). Charles contends the same reasoning applies here. Like *Wicklund*, the trial court's ruling shows that it relied heavily on the expert testimony advocating that "the less change that these children have to deal with[,]

16

the better." 2 RP at 348. Indeed, the Court of Appeals followed *Wicklund* when it struck the restriction on Rachelle's conduct but upheld the residential provisions of the parenting plan. *Black*, No. 46788-7-II, slip op. at 1.

But since *Wicklund* was decided, courts have recognized that members of the LGBT[8] community are vulnerable to discrimination. *See, e.g., Obergefell v. Hodges*, __ U.S. __, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015) (holding unconstitutional state laws that prohibit same-sex marriage; abrogating *Andersen v. King County*, 158 Wn.2d 1, 138 P.3d 963 (2006)); *see also Smithkline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471 (9th Cir. 2014) (holding that heightened scrutiny applies to classifications based on sexual orientation and that equal protection forbids striking a juror on the basis of sexual orientation).

To guard against discriminatory impulses in custody proceedings, many jurisdictions prohibit consideration of a parent's sexual orientation unless there is an express showing of harm to the children. *See, e.g., Damron v. Damron*, 2003 ND 166, 670 N.W.2d 871, 875 ("[I]n the absence of evidence of actual or potential harm to the children, a parent's homosexual relationship, by itself, is not determinative of custody."); *see also Jacoby v. Jacoby*, 763 So. 2d 410, 413 (Fla. 2000) ("For a court to properly consider conduct such as [the mother's] sexual orientation on the issue of custody, the conduct must have a direct effect or impact upon the children. . . .

---

[8] Lesbian, gay, bisexual, and transgender.

17

The connection between the conduct and the harm to the children must have an evidentiary basis; it cannot be assumed."). Even if a parent's sexual orientation is contrary to the children's religious values, a trial court may not consider it in a custody determination unless the evidence shows "direct harm to the children." *Fox v. Fox*, 1995 OK 87, 904 P.2d 66, 68-69.

This approach promotes fairness by fostering an attitude of neutrality. Contrary to *Wicklund*, which upheld residential provisions in a parenting plan despite the trial court's lack of neutrality, courts must remain neutral toward a parent's sexual orientation in order to ensure that custody decisions are based on the "needs of the child rather than the sexual preferences of the parent." *Cabalquinto*, 100 Wn.2d at 329. This neutrality requirement fulfills an underlying purpose of the dissolution statutes by protecting families who are otherwise vulnerable to the "arbitrary imposition of the court's preferences." *Chandola*, 180 Wn.2d at 655. Washington courts apply an analogous requirement for "strict impartiality" regarding parents' conflicting religious beliefs. *Munoz v. Munoz*, 79 Wn.2d 810, 813, 489 P.2d 1133 (1971). When the record suggests the trial court failed to maintain a neutral attitude, absent an express showing of direct harm,[9] we cannot be

---

[9] A valid showing of harm cannot rely on an assumption that a parent's sexual orientation is inherently harmful to his or her children. Such an assumption is contrary to the neutral approach fairness demands. *See* Kim H. Pearson, *Sexuality in Child Custody Decisions*, 50 FAM. CT. REV. 280, 281 (2012).

confident that the trial court's allocation of residential time serves the best interests of the children rather than "penaliz[ing] . . . parents for their conduct." *Cabalquinto*, 100 Wn.2d at 329.

The record here shows the trial court did not remain neutral when it considered Rachelle's sexual orientation as a factor for determining provisions in the parenting plan. Although the trial court concluded that Charles is the more stable parent for a number of potentially legitimate reasons, including his availability to the children and the parenting duties he performed in the years preceding the dissolution, the record indicates that Rachelle's sexual orientation influenced the trial court's written ruling and final parenting plan. For example, the trial court found that Charles was the more stable parent in part because he is better suited to maintain the children's religious upbringing, which includes certain beliefs about same-sex relationships:

> Here, [Charles] is clearly the more stable parent in terms of the ability to provide for the needs of these children, both financially as well as emotionally and in maintaining their religious upbringing. These children have been taught from the Bible since age 4. I believe it will be very challenging for them to reconcile their religious upbringing with the changes occurring within their family over issues involving marriage and dissolution, as well as homosexuality.

CP at 40-41. We agree with Charles that the trial court's language here is not as egregious as the trial court's in *Cabalquinto*.[10] But even though the trial court here

---

[10] *See* 100 Wn.2d at 328 ("In his oral opinion, the trial judge expressed a strong antipathy to homosexual living arrangements. He expressed the view that 'a child should be led in the way of heterosexual preference, not be tolerant of this thing [homosexuality]' and that 'it can[not] do

did not explicitly suggest that Rachelle's sexual orientation made her an unfit parent, its reasoning is nevertheless clear: the children are allegedly uncomfortable with homosexuality due to their religious upbringing, Charles—a heterosexual who shares those same beliefs—is better suited to maintain that religious upbringing, therefore, he is the more stable parent. Leblanc advocated this same reasoning in her final recommendation and in her testimony, which the trial court relied on and largely adopted in its final ruling. Absent any other evidence, such reasoning unfairly punishes a parent in a custody proceeding on the basis of her sexual orientation.

The trial court also adopted a restriction on Rachelle's conduct that prohibited her from discussing "alternative lifestyles" with her children:

> [Rachelle] is ordered to refrain from having further conversations with the children regarding religion, homosexuality, or other alternative lifestyle concepts and further that she be prohibited from exposing the children to literature or electronic media; taking them to movies or events; providing them with symbolic clothing or jewelry; or otherwise engaging in conduct that could reasonably be interpreted as being related to those topics unless the discussion, conduct or activity is specifically authorized and approved by Ms. Knight.

CP at 49. These references indicate the trial court based its ruling, at least in part, on Rachelle's sexual orientation. The prohibitions assume that a parent's discussion of sexual orientation or her own life and beliefs would have a negative impact on the children. The trial court's unnecessary references to "homosexuality" and

---

the boy any good to live in such an environment. It might do some harm.'" (alterations in original)).

20

"alternative lifestyle concepts" cast doubt on its ruling. CP at 49. This is particularly true given the trial court's written ruling emphasizes that both parents have strong relationships with the children and that they both have "good potential for future performance of parenting functions." CP at 40.

In addition to the trial court's written ruling and final parenting plan, the record indicates that improper bias influenced the trial court's decision. For example, Leblanc made several problematic statements suggesting she was biased against Rachelle.

First, Leblanc repeatedly referred to Rachelle's sexual orientation as a "lifestyle choice." Resp't's Sealed Ex. 39, at 7; Suppl. Br. of Pet'r at 6; *see also* Resp't's Sealed Ex. 40, at 21 ("All of those decisions [including deciding to start a relationship] were a matter of choice and all of those choices are inconsistent with teachings and principles that she and [Charles] elected to share with their children.").[11] This is contrary to our current understanding of sexual orientation. *See Obergefell*, 135 S. Ct. at 2596 ("Only in more recent years have psychiatrists

_____

[11] In her final report and at trial, Leblanc denied that she intended to refer to Rachelle's sexual orientation as a "'choice.'" Resp't's Sealed Ex. 40, at 21; 1 RP at 43. But read in context, it is difficult to see what else she might have meant:

It is significant to note that the children, who have been enrolled in and attending a private Christian school since they each reached school age, have no idea that [Rachelle] now considers herself to be a lesbian. While it is not my intent to cast judgment on [Rachelle's] lifestyle choice, the fact remains that it is a choice that can result in significant controversy.

Resp't's Sealed Ex. 39, at 7; see also Suppl. Br. of Pet'r at 6.

and others recognized that sexual orientation is both a normal expression of human sexuality and immutable.").

Second, Leblanc suggested that the controversy surrounding Rachelle's sexual orientation could harm the children by inviting bullying. Other courts have expressly rejected this reasoning in custody disputes. *Jacoby*, 763 So. 2d at 413; *see also Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S. Ct. 1879, 80 L. Ed. 2d 421 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

Third, Leblanc recommended an unconstitutional restriction of Rachelle's conduct that prohibited her from discussing religion, homosexuality, and "other alternative lifestyle concepts" with her children. Resp't's Sealed Ex. 40, at 25. At trial, Rachelle's counsel asked Leblanc if she thought it would be fair to similarly limit Charles from having those same conversations. Leblanc admitted that it would be fair in light of the tension between the teachings at the children's church and Rachelle's sexual orientation. But Leblanc ultimately did not recommend a similar restriction on Charles' conduct despite this testimony.

Finally, Leblanc's opinion that Charles is the more stable parent seems to stem from a belief that Rachelle caused the separation:

> [Rachelle] did choose to spend a large majority of her time away from the home over the past three years; did choose to terminate the marriage; and is planning on living with [her partner]. All of those decisions were a matter of choice and all of those choices are

22

inconsistent with teachings and principles that she and [Charles] elected to share with their children. [Rachelle's] choices did disrupt her relationship with the children and given the family's faith and historical belief system, the choices have also created a great deal of controversy and confusion.

*Id.* at 21; *see also* Suppl. Br. of Pet'r at 7. But "custody and visitation privileges are not to be used to penalize or reward parents for their conduct." *Cabalquinto*, 100 Wn.2d at 329.

As a GAL, Leblanc is unlike a typical witness. She is appointed by the court, endowed with statutory powers, and required to engage in fact-finding and produce a final report on the court's behalf. RCW 26.09.220. A GAL acts as "an arm of the court" and is afforded quasi-judicial status. *Reddy v. Karr*, 102 Wn. App. 742, 744, 9 P.3d 927 (2000). Leblanc's testimony carried great weight, and the trial court's ruling indicates it relied heavily on Leblanc's opinions. It adopted many of Leblanc's conclusions verbatim, including the recommended restriction on Rachelle's conduct.

We have acknowledged the presence of biases in other contexts. *See State v. Saintcalle*, 178 Wn.2d 34, 46, 309 P.3d 326 (2013) (plurality opinion) ("[W]e all live our lives with stereotypes that are ingrained and often unconscious, implicit biases that endure despite our best efforts to eliminate them."). Similarly, one purpose of the dissolution statutes is to prevent "arbitrary imposition of the court's preferences" and thereby protect families who are otherwise "vulnerable to a trial court's biases." *Chandola*, 180 Wn.2d at 655. The record shows that Leblanc's bias

23

"found its way into the final judgment." *Jacoby*, 763 So. 2d at 414. The trial court's written ruling and the final parenting plan indicate it failed to remain neutral regarding Rachelle's sexual orientation. The trial court therefore abused its discretion when it designated Charles as the primary residential parent.

C. The trial court abused its discretion when it favored Charles' religious beliefs

We require an analogous attitude of neutrality regarding conflicting religious beliefs. Although a trial court may consider the parents' and the children's religious beliefs when fashioning a parenting plan under RCW 26.09.184(3), it may not favor either parent's religious beliefs without a clear showing of harm to the children:

> Thus, the rule appears to be well established that the courts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for custody or restrain any person having custody or visitation rights from taking the children to a particular church, except where there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child.

*Munoz*, 79 Wn.2d at 813; *see also In re Marriage of Jensen-Branch*, 78 Wn. App. 482, 490, 899 P.2d 803 (1995) ("[T]here must be a substantial showing of actual or potential harm to the children from exposure to the parents' conflicting religious beliefs.").

Given the facts of this case, the trial court's improper consideration of Rachelle's sexual orientation was intertwined with an implicit preference for Charles' religious beliefs. Charles has continued to participate in a religion that

24

condemns same-sex relationships, while Rachelle has modified her religious views. Because the children were taught certain religious beliefs,[12] the trial court concluded Charles was better suited to maintain those beliefs and therefore was the more stable parent. In so concluding, the trial court made no express findings of actual or potential harm to the children due to Rachelle's modified religious views. *Jensen-Branch*, 78 Wn. App. at 491-92.

Charles correctly notes that *Munoz* and *Jensen-Branch* involved restrictions on parental conduct during visitation, not residential provisions of a parenting plan. *See Munoz*, 79 Wn.2d at 811 (father was prohibited from taking children to Catholic church services while in his custody). But the language in *Munoz* applies equally to residential provisions. *Id*. at 813 ("[C]ourts should maintain an attitude of strict impartiality between religions and should not disqualify any applicant for *custody*" unless there is a showing of harm. (emphasis added)). It would make little sense if courts needed to approach restrictions on parental conduct with "an attitude of strict impartiality between religions" only to abandon that attitude when fashioning other residential provisions. *Id*. Accordingly, the trial court abused its discretion not only

---

[12] We note that there is little evidence in the record of the children's religious views. The record contains, at most, circumstantial evidence of their religious views regarding same-sex relationships, most notably the nature of their private schools and their church. The children were never asked about their views, and no witness testified to what they actually believe. This circumstantial evidence, without any evidence of actual or potential harm to the children, is insufficient for the "clear and affirmative showing" required under *Munoz*, 79 Wn.2d at 813.

by considering Rachelle's sexual orientation as a factor in allocating residential time, but also by impermissibly favoring Charles' religious beliefs.

D.     The record here requires remanding the other provisions of the parenting plan

Rachelle also argues the trial court abused its discretion when it granted Charles sole decision-making authority regarding education and when it denied her request for spousal maintenance.  We agree.

Bias against Rachelle permeated the proceedings here.  Leblanc's testimony and final report, and the trial court's reliance on them, evince a presumption that Rachelle's sexual orientation is inherently disruptive to the children.  The evidence of bias casts doubt on the trial court's entire ruling.  Therefore, we are not confident that the trial court ensured a fair proceeding by remaining neutral regarding Rachelle's sexual orientation.  We therefore reverse and remand the education provision and the trial court's denial of spousal maintenance.  Given the nature of our conclusion, we agree with Rachelle that the case on remand should be reassigned to a different judge.  *State v. McEnroe*, 181 Wn.2d 375, 387, 333 P.3d 402 (2014) (Reassignment may be sought where "the trial judge will exercise discretion on remand regarding the very issue that triggered the appeal and has already been exposed to prohibited information, expressed an opinion as to the merits, or otherwise prejudged the issue." (footnotes omitted)).

## IV. CONCLUSION

The trial court here failed to remain neutral regarding Rachelle's sexual orientation and impermissibly favored Charles' religious beliefs. Further, evidence of bias permeated the proceedings. We reverse.

Fairhurst, C.J.

WE CONCUR:

_____
Madsen, J.

_____
González, J.

_____

_____

_____

*In re Marriage of Black*

No. 92994-7

WIGGINS, J. (concurring)—I concur with most of the majority opinion. I write separately to express my disagreement with the majority's reason for remanding to a different judge. The statements the majority found to be biased were not expressed by the judge in this case, but by the guardian ad litem. *See* majority at 13. The judge himself made it clear that Ms. Black's sexual orientation was irrelevant to his decision. Clerk's Papers at 41. I do not share my colleagues' confidence that on remand, the trial judge would be biased or unfair.

But we are also concerned with the appearance of fairness. A judicial proceeding appears fair "if a reasonably prudent, disinterested observer would conclude that the parties received a fair, impartial, and neutral hearing." *State v. Gamble*, 168 Wn.2d 161, 187, 225 P.3d 973 (2010).

This case concerns a particularly charged issue. A disinterested observer might conclude that neutrality on remand is unlikely. As a result, I concur in the majority's decision to reassign the case in order to preserve the appearance of fairness.

_____
Wiggins, J.

Stephens, J.