763 So.2d 410 (2000)
Julie K. JACOBY, Appellant,
v.
David E. JACOBY, Appellee.
No. 2D98-4790.
District Court of Appeal of Florida, Second District.
May 26, 2000.
*412 Jean R. Simons, Fairfax, Virginia, for Appellant.
John K. Finch, Safety Harbor, for Appellee.
Stephen R. Scarborough and Beatrice Dohrn, Atlanta, for Amicus Curiae, Lambda Legal Defense Fund.
NORTHCUTT, Judge.
The circuit court dissolved the marriage of Julie and David Jacoby in November 1998. Mrs. Jacoby challenges several aspects of the final judgment, including the court's designation of Mr. Jacoby as primary residential parent of the parties' children. We agree with Mrs. Jacoby on the custody issue, and reverse on that point. We also remand for reconsideration of her application for an award of attorney's fees and costs.

Primary residential custody of the children.
Two daughters were born during the marriage, one in August 1989 and the other in October 1992. In November 1996, Mrs. Jacoby informed her husband that she had fallen in love with a longstanding family friend who is a lesbian. The parties separated. Mrs. Jacoby and the children moved into the home of her lesbian partner; Mr. Jacoby stayed in the marital home. After the separation, the children began to visit Mr. Jacoby every other weekend. Then, in September or November 1997, the parties agreed to rotating custody, and the children alternated between the two homes on a weekly basis. This arrangement continued until November 1998, when the circuit court entered its final judgment. During the period of separation and rotating custody, the children continued attending a private school affiliated with a Baptist church, where they had been enrolled before the break-up of the marriage.
Both parties sought primary residential custody of the two girls. Mrs. Jacoby proposed that they live with her and her partner in the home they had shared since the separation. The father became engaged while the divorce was pending. He intended to marry and move into a home owned by his new wife when the dissolution was final. If he were awarded custody, the girls would live with him, his new wife and her teenaged children. They would attend public school in the neighborhood of his new home, which was in the same county as the marital home, but not nearby.
Numerous witnesses testified at trial, including the mother, her partner, the father, his fiancée and a court appointed psychologist. The mother had been the children's primary caretaker during the marriage and the initial period of separation, and the father admitted she was a great parent. But the father, too, had become a better and more involved parent during the rotating custody. The psychologist confirmed that both parties were good parents, but he concluded that Mrs. Jacoby had an edge in parenting skills. She was more adept at demonstrating affection, he said. In addition, the children had stronger emotional ties to her, and she could provide a fine home environment. The psychologist also believed that Mrs. Jacoby would be the custodial parent more likely to encourage contact with the non-custodial parent. He recommended that she be assigned primary residential responsibility for the children.
As often happens in child custody cases, each parent attempted to prove examples of the other's lapses in parental judgment. *413 The court wisely refused to consider a number of these minor conflicts in deciding which parent should have primary residential responsibility for the girls. At the same time, however, the court's remarks during the final hearing and in the final judgment demonstrate that it succumbed to the father's attacks on the mother's sexual orientation, which were the primary feature of this case.
For a court to properly consider conduct such as Mrs. Jacoby's sexual orientation on the issue of custody, the conduct must have a direct effect or impact upon the children. See Maradie v. Maradie, 680 So.2d 538 (Fla. 1st DCA 1996). "[T]he mere possibility of negative impact on the child is not enough." Id. at 543. The connection between the conduct and the harm to the children must have an evidentiary basis; it cannot be assumed. See id. We have reviewed the court's comments concerning the negative impact of the mother's sexual orientation on the children, and have found them to be conclusory or unsupported by the evidence.
For example, the final judgment stated that "[t]here is no doubt that the husband feels the current living arrangement of the wife is immoral and an inappropriate place in which to rear their children.... Obviously, this opinion is shared by others in the community." But the latter is not obvious to us from this record. In fact, there was no evidence addressing "the community's" beliefs about the morality of homosexuals or their child rearing abilities.
The order then addressed the community's reaction to homosexuals, by paraphrasing the psychologist's testimony: "Dr. Merin testified that a strong stigma attaches to homosexuality and that while being reared in a homosexual environment does not appear to alter sexual preference, it does affect social interaction and that it is likely that the children's peers or their parents will have negative words or thoughts about this." (emphasis supplied). The court mischaracterized Dr. Merin's testimony. In response to the question "and it's your understanding that you say times are changing ..., but there is still a stigma socially attached with homosexual lifestyles in our society?" Dr. Merin responded "yes." He did not quantify the degree. He did remark that "[i]n our society it is now the likelihood that there would be words spoken or thoughts, negative thoughts or concerns by children's peers or the parent of their peers...." Dr. Merin's actual testimony about social interaction was: "research would indicate that the considerations would be given more to their social interaction than to the great degree of probability that they would themselves, you know, develop homosexual characteristics."
But even if the court's comments about the community's beliefs and possible reactions were correct and supported by the evidence in this record, the law cannot give effect to private biases. See Palmore v. Sidoti, 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984); cf. Department of Health and Rehabilitative Services v. Cox, 627 So.2d 1210 (Fla. 2d DCA 1993) (stating that private biases against homosexuality are not a permissible rational basis to support statute banning homosexuals from adopting), approved in part, quashed in part, 656 So.2d 902 (Fla.1995). Moreover, even if the law were to permit consideration of the biases of others, and even if we were to accept the assumption that such would necessarily harm the children, the bias and ensuing harm would flow not from the fact that the children were living with a homosexual mother, but from the fact that she is a homosexual. See Conkel v. Conkel, 31 Ohio App.3d 169, 509 N.E.2d 983 (1987); M.P. v. S.P., 169 N.J.Super. 425, 404 A.2d 1256 (App.Div.1979). The circuit court's reliance on perceived biases was an improper basis for a residential custody determination.
The final judgment also contained unsupported findings concerning the effect on the children of religious teachings about *414 homosexuality. The judgment stated: "Dr. Merin testified that once the children learn about homosexuality and religious teachings, real confusion and conflict will arise for them." (emphases supplied.) Again, the order does not accurately reflect Dr. Merin's views. Concerning a possible conflict between religious teachings and homosexuality, Dr. Merin opined that as the children get older, they may become confused, but that their level of comfort would be affected by how the situation was handled. This was the only testimony about the possible effects of religious teaching on the children, and it did not support a finding that the mother's sexual orientation will harm the children.
Moreover, the record contains no competent evidence about what, if any, religious teaching the children were exposed to. Yet the judge criticized Mrs. Jacoby's decision to keep the children in the church-affiliated school they had been attending, stating he "[could not] determine if [the mother] is naive or simply blase, but she has made absolutely no effort to determine how her current lifestyle might adversely impact the children in their current school environment." These words are disquieting for several reasons. First, ironically, they betray the influence of religious stereotyping. Several witnesses testified about the Baptists' beliefs without ever explaining the sources of their knowledge. When Mr. Jacoby's attorney asked Dr. Merin if he knew the Baptists' position on homosexuality, the doctor responded that they were strongly opposed to it. Mr. Jacoby also testified he had learned that the Baptist religion was against homosexuality. At one point, the trial court itself questioned Mrs. Jacoby directly, asking whether she was aware that "the Baptists" had boycotted Disney World. None of this was competent evidence; nothing in the record suggested that the psychologist, Mr. Jacoby, or the trial court was qualified to expound on Baptist doctrine.
Second, no evidence was presented to show to what degree, how, or even whether this supposed Baptist doctrine of anti-homosexuality was espoused at the children's school or, for that matter, at the church with which it was affiliated. Indeed, the only evidence with any bearing on these questions suggested an atmosphere of tolerance; Mr. and Mrs. Jacoby both testified that the school employed a teacher who was widely known to be homosexual. The court's question about "Disney World" presumably referred to the 1996 and 1997 votes by attendees at the Southern Baptist Convention to boycott the Walt Disney Company in part because it extended health benefits to employees in same-sex relationships. But there was no evidence in this record about that boycott. The court's implication either that Baptists were unanimous in that position or that the Southern Baptist Convention wields some sort of hierarchal authority over Baptist churches and schools had no evidentiary support.
Third, while criticizing Mrs. Jacoby for failing to investigate Baptist teachings on homosexuality, the court chose to ignore Mr. Jacoby's own similar failings. Mr. Jacoby testified that he intended to convert to Catholicism after his remarriage, and he had been taking the girls to a Catholic church. But he conceded that he did not know the Catholic tenets on homosexuality.
In short, there was no evidence to show that the children were being harmed or would be harmed by their continued enrollment in the school they had attended during the parties' marriage. Nor does the record disclose that Mrs. Jacoby's decision to keep the children in that school was any less informed than Mr. Jacoby's desire to take them out of it.
Mrs. Jacoby's sexual orientation found its way into the final judgment in other ways. The judgment referred to the father's fiancée's house as "a very appropriate home" and a "very nice home." It went on to state that "[t]he preference of this home to the one proposed by the wife is obvious...." Again, although we are *415 confident that the court accurately assessed Mr. Jacoby's new home, the obviousness of its preference is not apparent from the evidence. Nothing in the record suggested that Mrs. Jacoby's house was physically inappropriate for raising children; that is, that it was too small or in an unsavory neighborhood, or some such. In fact, the evidence showed it was a three bedroom home, that the girls shared their own bedroom, and that they had a computer complete with children's games.
If the court's "obvious" preference was based on the father's heterosexual relationship, it was akin to the custody award to the father in Packard v. Packard, 697 So.2d 1292, 1293 (Fla. 1st DCA 1997), based solely on the fact that he lived in a "more traditional family environment." As did the First District in Packard, we reject such a determination when no evidence showed harm to the children resulting from the "nontraditional" environment. See also Maradie, 680 So.2d at 542-543 (rejecting as improper the taking of judicial notice that "a homosexual environment is not a traditional home environment, and can adversely affect a child").
The court also found that when the Jacoby children have spent time with the father in the company of his fiancée and her children "there has been absolutely nothing inappropriate in the presence of the children or during the time they may have spent the night in the home." We have no quarrel with this finding, which is amply supported by the evidence. But Mr. Jacoby's counsel has endeavored to contrast this fact with a charge that Mrs. Jacoby and her partner were not so circumspect in their behavior. In his written closing argument to the circuit court, in his brief on appeal, and at oral argument the father's counsel repeatedly intoned that the evidence proved the two women allowed the children in their bed when the adults were topless. After carefully reviewing the record, we dismiss this accusation as specious innuendo, intended to imply that the women engaged in sexual conduct in the children's presence. The record citation tendered for this assertion was the father's testimony that one of the girls, upon seeing him working in the yard shirtless, commented "that [he] was topless and [he] slept topless like mommy does." While the mother acknowledged that she and her companion slept together, and that sometimes the children were allowed into their mother's bed to snuggle, these facts simply do not support the inference the father promotes. For its part, the trial court made no finding that Mrs. Jacoby had ever engaged in sexual conduct in the children's presence. We are satisfied that it was no more taken in by this canard than we are.
In summary, when making this custody determination the circuit court penalized the mother for her sexual orientation without evidence that it harmed the children. Accordingly, we reverse the court's appointment of the father as primary residential parent, and remand with directions to enter a new custody order. Because we are remanding, we further note that a number of the court's other findings under the custody factors set out in section 61.13(3), Florida Statutes (1997), were not supported by the evidence, and in some cases were contrary to the undisputed evidence. In reaching a new custody decision, the court must reconsider these factors.
Section 61.13(3)(d) requires that a court consider "[t]he length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity." The final judgment found "that due to the rotating custody, there has been no stable environment favoring one parent over the other...." Similarly, section 61.13(3)(h) directs the court to weigh "[t]he home, school and community record of the child." Again, the court found this factor did not favor either parent because of the rotating custody.
*416 The court appropriately assessed these factors in light of the rotating custody, which had been in effect for a year or more. But its findings ignored the father's stated intention to move the children from the former marital home, which was his residence during the rotation and was the children's residence before the separation, to a new home located in a neighborhood where they were not accustomed to living. Additionally, they would be attending a new school. The mother testified without contradiction that she had continued the children in their prior school, over the husband's objections, because she wanted them to have some continuity after the parties' separation. Finally, the husband's proposed residence included his new wife and teenaged stepchildren. While even the mother testified that the children seemed to like the husband's fiancée, this woman was a relatively new figure in their lives. In contrast, the court overlooked the evidence that the mother's partner, who was her employer and had been a family friend before the separation, had known the children since their births. The psychologist testified that the children's artwork was very positive concerning their mother and her partner. He believed the father's fiancée was an "unknown quantity." The court's conclusory finding that, because of the rotating custody arrangement, the factors in sections 61.13(3)(d) and (h) had no bearing on this case was not supported by the evidence.
In its finding concerning the permanence of the proposed custodial homes, section 61.13(3)(e), the court focused on the psychologist's speculation that the mother might not, in fact, be homosexual. If that turned out to be true, the court ventured, "the permanence of her home becomes quite suspect." But, such conjecture aside, the fact was that the mother had been living with her partner for two years. Moreover, when weighing this factor the court was not free simply to disregard undisputed facts which called into doubt the permanence of the father's home. As had the mother, the father had been married once before this marriage. As was the mother, the father was embarking on a new relationship, and proposing to move the children into his third marital home.
Finally, the court noted that the legislature must have believed that the fostering of a relationship between the children and the noncustodial parent was very important because it addressed this issue twice, in sections 61.13(3)(a) and (j).[1]See Adair v. Adair, 720 So.2d 316 (Fla. 4th DCA 1998). The final judgment found that while the father "does not wish the children to reside overnight with their mother while she is actively engaged in a homosexual relationship ... this can be softened by counseling or court fiat." As we previously discussed, the court also found that Mr. Jacoby felt Mrs. Jacoby's living arrangement was "immoral" and an "inappropriate place in which to rear their children." As for the mother, the court found she had little respect for the father. Indeed, Mrs. Jacoby's testimony showed, and Dr. Merin's confirmed, that she was somewhat rigid and that she tended to pester Mr. Jacoby over relatively minor details associated with visitation.
We are taken aback, though, by the court's declaration that the father's deep-seated animosity toward the mother's homosexuality could be softened, and by its clear implication that the mother's inflexibility could notand we have searched in vain for record evidence to support either view. Again, the language of the order is discomfiting: "While testifying that the children are the focus of her life, [the mother's] conduct in adamantly refusing to *417 make minor changes in scheduling which would result in her seeing the children for greater periods of time would seem to speak volumes about how she really feels." The court's speculation flew in the face of Dr. Merin's testimony, in which he opined that the children were, indeed, Mrs. Jacoby's primary focus, and in which he concluded that, her rigidness notwithstanding, she was the parent who was most likely to encourage a relationship with the noncustodial parent. Again, the evidence did not support the court's findings on this statutory factor.

Retroactive child support.
Section 61.30(17), Florida Statutes (1997), permits the circuit court in its discretion to award child support retroactive to the date the parties last lived together with the children. Mrs. Jacoby contends the court abused its discretion by failing to award her retroactive child support for the period between the parties' separation date and the commencement of the rotating custody arrangement. We disagree. Under the circumstances of this case, we find no abuse of discretion in the court's failure to make such an award.

Attorney's fees and costs.
The circuit court denied Mrs. Jacoby's request for a contribution to her attorney's fees and costs, finding that the parties were in relatively equal financial circumstances following equitable distribution and factoring in their respective obligations to support the children. We disagree. To be sure, the parties received equal shares of the modest marital assets and liabilities. But after considering the parties' support obligations to the children, Mr. Jacoby's net income was almost half again larger than Mrs. Jacoby's. When determining the propriety of an attorney's fee award in a dissolution case, the primary factor a court should consider is the financial resources of the parties. See Rosen v. Rosen, 696 So.2d 697, 700 (Fla.1997). Under these circumstances, Mrs. Jacoby was entitled to a contribution to her reasonable attorney's fees and costs.[2]
Given that the parties' relative financial circumstances may change after the circuit court reconsiders the custody award, at this time we decline to direct the court to make a fee and costs award. Rather, we reverse the denial of Mrs. Jacoby's request and remand to reconsider it along with the custody issue, in light of this opinion.
Reversed in part, affirmed in part, and remanded.
STRINGER, J., Concurs.
THREADGILL, A.C.J., Dissents with opinion.
THREADGILL, Acting Chief Judge, Dissenting.
I respectfully dissent from that portion of the majority opinion that reverses the award of primary residential responsibility for the children to Mr. Jacoby.
In reviewing a true discretionary act, such as an award of child custody, an appellate court must fully recognize the superior vantage point of the trial court and apply a test of reasonableness to determine whether the trial court abused its discretion. See Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980). If reasonable men could differ as to the propriety of the trial court's action, then it cannot be said the trial court abused its discretion. See id. at 1203.
In this case, I believe the trial court gave thorough consideration to the criteria set forth in section 61.13(3), Florida Statutes (1997). I am convinced that the trial court limited its consideration of Mrs. Jacoby's sexual orientation to the effect it would have on the best interests of the children. Unlike the majority, I believe there is competent, substantial evidence in *418 the record to support the relevant findings of the trial court. Under such circumstances, I conclude that the trial court did not abuse its discretion in awarding primary residential responsibility to Mr. Jacoby. I would affirm on that issue. Otherwise, I concur in the majority opinion.
NOTES
[1] Section 61.13(3)(a): "The parent who is more likely to allow the child frequent and continuing contact with the nonresidential parent."

Section 61.13(3)(j): "The willingness and ability of each parent to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent."
[2] The circuit court did not make any findings that the other factors discussed in Rosen v. Rosen, 696 So.2d 697 (Fla.1997), applied in this case. Our review of the record confirms that none are applicable.